**In re GOLDBLATT BROS., INC., including previously separate, Debtor.**

**Bankruptcy No. 81 B 7075.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Sept. 24, 1986.

**338**

Robert B. Chatz, John W. Costello, Charles S. Stahl, Jr., James T. Arvey, Michael R. Enright, Karen H. Kennedy, Arvey, Hodes, Costello & Burman, Chicago, Ill., for Unsecured Creditors' Committee.

Malcolm M. Gaynor, David N. Missner, Paula K. Jacobi, Schwartz, Cooper, Kolb & Gaynor, Chartered, Chicago, Ill., for Arlington Plaza Limited Partnership.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

This cause coming on for trial on the issues posed by claim No. A–103 of Arlington Plaza Limited Partnership ("Arlington") for $3,704,223.18 and the objections thereto of the Unsecured Creditors' Committee of Goldblatt Bros. ("Committee"), the Court having taken and considered evidence offered by the parties and the respective proposed Findings of Fact and Conclusions of Law and Memoranda of Law submitted by the parties by way of final argument, the Court being fully advised in the premises does hereby make and enter the following Findings of Fact and Conclusions of Law. Fact findings contained in the Conclusions of Law shall stand as additional Findings of Fact. Legal conclusions contained in the Findings of Fact shall stand as additional Conclusions of Law.

## INTRODUCTION

### Arlington's Position

Arlington filed a claim for damages it suffered as a result of Goldblatt's abandonment of its 25 year lease with Arlington. The damages were claimed to include unpaid rents, taxes and common area maintenance expenses, remodeling and reconstruction costs necessary to relet the premises to new tenants, brokerage commissions incurred in the relating the leased premises, attorney's fees incurred in those transactions, interest expense on the remodeling and reconstruction costs, and other items. Further, the Lease was a "net-

net" lease under which Goldblatt's was to pay the costs of heating, ventilation and air conditioning maintenance and to make all roof repairs at its expense. The replacement leases under which Arlington was able to relet the premises do not obligate the new tenants to make such repairs.

Pursuant to the agreement between Arlington and Goldblatt which was approved by the Court on June 17, 1981, Goldblatt's specifically agreed that all the above described damages were a part of Arlington's claim under Section 502(b)(7) [now Section 502(b)(6)] of the Bankruptcy Code. The claim heretofore filed by Arlington sets forth only those damages incurred as of February, 1982. Arlington claims that it will also incur additional damages over the life of the Lease.

Arlington acknowledged at trial that its claim is limited by the Bankruptcy Code to 15% of the rent reserved by the Lease which does not exceed three years of rent. Based upon the rent for the first three years from the date Goldblatt's abandoned the leased premises, the statutory limit is $2,658,216.54. It further contends that rent reserved under the lease includes taxes and common area maintenance expenses to be paid by Goldblatts as well as the fixed rent set forth under the lease. The Committee has admitted that the rent due as of June 15, 1981, when Goldblatts vacated the premises totaled $350,343.93, including taxes and common area maintenance. Arlington claims that considering such past due rent and damages suffered as a result of the lease abandonment, its claim would be $3,704,223.18 if not limited by the statutory maximum. Therefore, it asks judgment for the statutory maximum of $2,658,216.54.

### Committee's Position

The Committee claims that under the Bankruptcy Code the statutory limit of Arlington's claim is $1,567,500.00 based upon the annual fixed rent of $475,000.00, without inclusion of the taxes and common area maintenance costs assessed under the Lease. The Committee also claims that the

claim of Arlington should be reduced by monies actually received by it for rent from reletting the premises to new tenants. The latter contention poses a major legal issue to be decided by the Court.

### FINDINGS OF FACT

1. Under a Lease Agreement dated November 9, 1977, between Goldblatt Brothers, Inc. ("Goldblatt"), as tenant, and Arlen Realty, Inc., as landlord (the "Lease"), Goldblatt leased from Arlen Realty, Inc., a portion of a shopping center located on Rand Road and Arlington Heights Road in the Village of Arlington Heights, Illinois ("Leased Premises").

2. Arlington is the successor in interest to Arlen Realty, Inc. under the Lease.

3. Arlington owns the entire beneficial right, title and interest in and to a certain trust with the Exchange National Bank of Chicago as Trustee under Trust Agreement dated February 1, 1979 and known as Trust No. 34951 ("Trustee").

4. Said Trustee is the assignee of Arlen Realty, Inc., as the landlord under the Lease.

5. The Lease term is twenty five years, beginning February 1, 1978 and ending January 31, 2003.

6. The Lease is a triple-net lease.

7. Under the Lease, Goldblatt was required to maintain all buildings on the Leased Premises and to make all repairs, alterations, replacements, additions and improvements of every nature and description required for such maintenance whether ordinary and extraordinary, structural or nonstructural, interior or exterior, whether originally included or subsequently installed in the Leased Premises, including boilers, engine room equipment, heating and air conditioning, water, gas, sewer, electric connections, pipe and conduits.

8. Under the Lease, Goldblatt was required to pay all charges for water, heat, gas, electricity, sewage disposal and other utilities used at the Leased Premises.

9. The rent reserved under the Lease consisted of three components: fixed rent of $475,000.00 annually; Goldblatt's portion of the common area maintenance expenses ("CAM"); and, Goldblatt's portion of real estate taxes assessed against the common areas ("Taxes"). Fixed rent, CAM and taxes due under the Lease are collectively referred to herein as "Reserved Rent".

10. In March, 1981, Goldblatt defaulted under the Lease by terminating its business operations in the Leased Premises and by failing to pay Reserved Rent.

11. On June 15, 1981, Goldblatt filed its petition for relief under Chapter 11 of the Bankruptcy Code.

12. On June 17, 1981, pursuant to Stipulation and Order entered by the Bankruptcy Court (the "Order"), Goldblatt entered into an Agreement with Arlington which provided, in part, that Goldblatt surrender the Leased Premises to Arlington (the "Agreement").

13. Under the Order and Agreement, Goldblatt's obligations under the Lease were not released and are still in effect.

14. (a) Under the Order and Agreement, Goldblatt stipulated that as a result of Goldblatt's surrender of the Leased Premises and default under the Lease, Arlington would suffer and sustain damages, losses and expenses including, but not limited to, damages, losses and expenses by reason or result of (i) the nonpayment by Goldblatt of the Reserved Rent; (ii) Arlington's incurrence or expenditure of substantial sums of money including, but not limited to, remodeling and reconstruction of the interior and exterior of the Leased Premises in order to divide the Leased Premises to make same suitable to be occupied by new tenants; (iii) interest on monies owing by Goldblatt under the Lease and interest on any amount borrowed by Arlington to do the remodeling and reconstruction; (iv) brokerage commissions with respect to new rentals; and (v) attorneys fees.

(b) The Court-approved Agreement provided in pertinent part:

3. *Arlington Plaza Damages, Losses and Expenses:* Subject to the provisions of § 502(b)(7) of the Bankruptcy Code, 11 U.S.C. § 502(b)(7) [this section is now § 502(B)(6)], the Trustee and Arlington Plaza, or either, shall have a claim against the Debtor for all damages, losses and expenses, including, but not limited to, damages, losses and expenses sustained and suffered by them, or either, by reason or as a result of: (1) the nonpayment by Debtor of rental, general taxes and common area maintenance; (2) incurring liability for or expending substantial sums of money, including, but not limited to, the remodeling and reconstruction of the interior and exterior of the leased premises in order to make the same suitable for lease to and occupancy by new tenants; and (3) interest on any amount owing by Debtor under the lease, and interest on any amount which may be borrowed by the Trustee or Arlington Plaza for such remodeling and reconstruction purposes, broker's commission in connection with such new leases, and attorneys' fees.

\*   \*   \*   \*   \*   \*

5. *Reletting of the Leased Premises:* After reletting of the leased premises by the Trustee or Arlington Plaza, it is agreed:

(a) Notwithstanding the provisions of § 502(b)(7) or any other provisions of the United States Bankruptcy Code, the Trustee or Arlington Plaza shall be entitled to the recovery in full, from any such reletting, of all damages, losses and expenses sustained, suffered, incurred or expended by the Trustee or Arlington Plaza in connection with the leased premises, as described in Subsections (1), (2) and (3) of Section 3 thereof. After such full recovery, any net profits which thereafter may be generated from such reletting of the leased premises will, so long as so generated, be divided between the parties as follows:

(i) Seventy-five percent (75%) thereof shall be paid to the Trustee or Arlington Plaza; and

(ii) Twenty-five percent (25%) thereof will be paid to Debtor for and during the remainder of the initial term of the Lease, i.e., until midnight on April 30, 2003.

(b) "Net profits" as used in Section 5(a) above shall be determined by the certified public accountants then regularly employed by Arlington Plaza in accordance with generally recognized accounting principles, practices and procedures, applied in a manner consistent with prior years.

(c) Within thirty (30) business days after receipt by the Trustee or Arlington Plaza of the Accountant's report with respect to such net profits, if any, Arlington Plaza shall mail or cause to be mailed to the Debtor a copy of such report, and if net profits shall have been generated for the applicable period, Arlington Plaza shall pay, or cause to be paid to Debtor its proportionate share thereof, concurrently with the mailing of said report. If Debtor shall not object in writing to said report within fifteen (15) business days after the receipt thereof, said report shall be and become binding and conclusive upon Debtor.

\*     \*     \*     \*     \*     \*

15. On February 24, 1982, Arlington filed a Proof of Claim for damages suffered as a result of Goldblatt's surrender of the Leased Premises and default under the Lease. The claim was numbered A–103 by the Bankruptcy Court, and claims $3,704,223.18.

16. Upon entry of the Order and Agreement, Arlington attempted to relet the Leased Premises to a single user.

17. Goldblatt also attempted to find a single user to take over the Leased Premises.

18. Neither Arlington nor Goldblatt were able to find any single user to occupy the entire Leased Premises during the several months following entry of the Order of June 17, 1981.

19. Following the effort to find a single user during that period, in order to relet the Leased Premises Arlington then subdivided the Leased Premises into four separate stores and did certain repair work to said premises.

20. If Arlington had not done the construction and repair work necessary to subdivide the Leased Premises into four stores and to put these four stores into good condition to relet, the Leased Premises could not at that time have been relet to other tenants.

21. After Arlington divided the Leased Premises into four stores, it relet one of the four stores to Handy-Andy ("Handy-Andy"), one to Aaron's Office Furniture ("Aaron"), one to Burlington Coat Factory ("Burlington"), and one to Castle Distributors ("Castle"), collectively referred to herein as the "New Tenants".

22. Arlington's leases with Burlington, Castle, Handy-Andy and Aaron all expire prior to the year 2003, the year when the Lease expires.

23. Arlington paid $666,619.26 for the construction and repair of these portions of the Leased Premises which were leased to Burlington, Aaron's and Handy-Andy.

24. Such construction and repair was needed to put those parts of the Leased Premises in condition to relet the same to Burlington, Aaron's and Handy-Andy.

25. Arlington paid in excess of $240,000.00 for the construction and repair of that portion of the Leased Premises which was leased to Castle.

26. Such construction and repair was needed to put the Leased Premises in condition to relet the same to Castle.

27. In order to induce Castle to rent the fourth portion of the Leased Premises, Arlington offered evidence that it also had to loan Castle $130,000.00. A portion of that loan is still outstanding. However, there was no evidence that Castle either has defaulted or will default thereon, and therefore no evidence to justify the claim that

the principal of that loan is a damage item here.

28. Arlington had to pay brokerage commissions of $53,057.81 to get the lease with Handy-Andy; $30,139.21 to get the lease with Aaron; $134,400.00 to get the lease with Burlington; and $56,000.00 (16 year lease × $100,000 per year × 3½% commission) to get the lease with Castle, for a total of $273,597.02 in brokerage commissions.

29. Prior to the year 2003, Arlington may have to pay additional brokerage commissions to relet the Leased Premises at the expiration of its leases with the New Tenants, but at present the necessity therefore and cost thereof can only be speculated.

30. Prior to the year 2003, and at the expiration of its leases with the New Tenants, Arlington may have to pay additional costs of construction and repair to put the Leased Premises in condition to relet the same, but at present the necessity therefore and cost thereof can only be speculated.

31. By January, 1983, the Leased Premises was finally fully occupied by all four of the New Tenants. Through that date, Arlington had lost $798,060.58 in Reserved Rent that Goldblatt was obligated to pay under the terms of the Lease and which was not paid by the New Tenants. $445,082.97 of the lost Reserved Rent was for Taxes and CAM Arlington had to pay and $352,977.61 was for fixed rent Arlington did not receive.

32. Arlington had to pay over $10,000.00 for utilities needed at the Leased Premises while Arlington was attempting to relet the Leased Premises.

33. In addition to construction costs set forth in Paragraphs 22 and 24, Arlington had to spend more than $50,000.00 to repair and put the heating, ventilating and air condition systems ("HVAC") on the Leased Premises in good working order for the New Tenants.

34. In addition to the construction costs set forth in Paragraphs 23 and 25, Arlington had to spend $10,000 in maintenance on the exterior of the Leased Premises, including caulking, brick work, repairing of steel beams, exterior lights, fixtures and gutters.

35. In addition to the construction costs set forth in Paragraphs 22 and 24, Arlington had to spend $40,000 in patching and repairing the roof of the Leased Premises.

36. The roof of the leased Premises must be replaced at least once during the period of the Goldblatt lease, for which Arlington will have to pay between $420,000 and $500,000.

37. Prior to the year 2003, Arlington may have to spend more to replace the roof for the Leased Premises for a second time. The life expectancy of the roof for the Leased Premises is approximately ten years. However, the necessity therefore and cost thereof can only be speculated on at present.

38. Prior to the year 2003, at the expiration of the New Tenants' leases, Arlington may have to pay more to replace the HVAC for the Leased Premises, but the necessity therefore and cost thereof can only be speculated on at present.

39. Additional repairs to the brick work on the back of the Leased Premises and to the loading dock over the Handy-Andy premises are now needed. Arlington will have to pay a minimum of $25,000 for this work.

40. As a result of Goldblatt's vacating the Leased Premises and defaults under the Lease, Arlington incurred approximately $30,000 in legal expenses between 1981 and 1983.

41. The legal expenses were incurred by Arlington in negotiating with Goldblatt when Goldblatt wanted to abandon the Leased Premises, in proceedings before the Bankruptcy Court relating to the Order and Agreement, and in negotiating leases with the New Tenants.

42. Arlington had to pay an architect $10,000 to re-design the Leased Premises to put it in condition to relet it to the New Tenants.

43. Arlington had to pay an engineer $3,000 to do the revisions needed for the electrical, water and sewer systems at the Leased Premises to put it in condition to relet it to the New Tenants.

44. Arlington had to spend approximately $3,500 to $5,000 in accounting expenses in preparing its Proof of Loss and obtaining ongoing loss calculation.

45. Arlington had to borrow all the funds needed to pay the costs of construction, brokerage commission, utilities, repairs of HVAC, loan of $130,000 to Castle, maintenance of truck docks, repairs of the roof, attorney, architecture, engineering and accountant expenses and CAM and taxes expenses that were incurred prior to the New Tenants' occupying the Leased Premises, set forth above in Findings hereinabove.

46. The total of the foregoing borrowings was $1,900,962.10, computed as follows:

| Amount | Year | Purpose |
|---|---|---|
| $666,619.26 | (1981) | construction of three stores |
| 240,000.00 | (1982) | construction of fourth store |
| 130,000.00 | (1983) | loan to Castle Distributors |
| 273,597.02 | (1981–82) | brokerage commissions for New Tenants' leases |
| 10,000.00 | (1982) | utilities prior to reletting |
| 50,000.00 | (1981–82) | HVAC repairs |
| 10,000.00 | (to date) | maintenance of truck dock and brick work at rear of Leased Premises |
| 40,000.00 | (to date) | roof repairs |
| 30,000.00 | (1981–82) | attorneys fees |
| 10,000.00 | (1981) | architecture fees |
| 3,000.00 | (1981) | engineering fees |
| 3,500.00 | (to date) | accountant fees |
| 434,245.98 | (1981–82) | CAM and Taxes unpaid by Goldblatt or New Tenants |

$1,900,962.10

47. Between 1981 and 1983, Arlington had to pay more than $450,000 in interest on the funds borrowed for purposes set forth in Paragraphs 45 and 46.

48. In 1984, Arlington's loan was approximately 2.2 million and Arlington had to pay approximately $300,000 in interest on the Borrowed Funds.

49. Arlington had to borrow funds to pay the above interest charges.

50. As of the date of trial, the monies borrowed by Arlington were still outstanding and interest has still accruing thereon.

51. If Arlington had been unable to borrow the monies needed for the construction and repair of the Leased Premises and other expenses of Arlington in getting the Leased Premises ready for New Tenants and maintaining the Leased Premises for the New Tenants, Arlington would have been unable to do the work needed to relet the Leased Premises.

52. For the year 1981, the fixed base rent under the Lease was $475,000; the CAM expenses for which Goldblatt was responsible totaled $42,865.96; and the 1981 taxes for which Goldblatt was responsible totaled $190,113.00.

53. For the year 1982, the fixed base rent under the Lease was $475,000; the CAM expenses for which Goldblatt was responsible totaled $65,733.27; and the 1982 taxes for which Goldblatt was responsible totaled $194,548.84.

54. For the year 1983, the fixed base rent under the Lease was $475,000; the CAM expenses for which Goldblatt was responsible totaled $56,390.81; and the 1983 taxes for which Goldblatt was responsible totaled $244,333.87.

55. For the year 1984, the fixed base rent under the Lease was $475,000; the CAM expenses for which Goldblatt was responsible totaled $65,938.77; and the 1984 taxes for which Goldblatt was responsible totaled $339,648.00.

56. The total amount of Reserved Rent due from Goldblatt for a three year period from June 15, 1981 through June 15, 1984 totaled $2,307,791.66.

57. The total unpaid Reserved Rent due under the Lease unpaid on the date Goldblatt filed its petition was $350,424.93.

58. Therefore, the statutory maximum allowable to Arlington under § 502(b)(6) of the Bankruptcy Code equals $2,658,216.59 (paragraph 56 plus paragraph 57).

59. Fifteen percent of the Reserved Rent due under the Lease for a period of three years out of the remaining term of

the Lease is greater than the Reserved Rent under the Lease for one year.

60. The date on which Goldblatt filed its petition herein in bankruptcy was earlier than the date on which Goldblatt surrendered the Leased Premises.

61. Fifteen percent of the Reserved Rent under the Lease for the remaining term of the Lease is greater than the Reserved Rent under the Lease for three years.

62. The amount spent by Arlington to construct and repair the Leased Premises, to put the Leased Premises in condition to relet the same to the New Tenants, including repair of the roof, HVAC, loading dock and rear wall, plus the leasing commissions for leases for New Tenants, legal, architectural and engineering expenses, interest costs and loan made to Castle exceeded the amount of Reserved Rent received by Arlington during said three year period.

63. The costs heretofore incurred by Arlington referred to in Paragraph 62 were necessary to relet the Leased Premises to the New Tenants.

64. The damages suffered by Arlington as a result of Goldblatt's abandonment of and default under the Lease to date exceed $2,939,000.00 and include the following:

| | | | |
|---|---|---|---|
| (a) | $666,619.26 | (1981) | construction of three stores |
| (b) | 240,000.00 | (1982) | construction of fourth store |
| (c) | 273,597.02 | (1981–82) | brokerage commissions |
| (d) | 10,000.00 | (1982) | utilities |
| (e) | 50,000.00 | (1981–82) | HVAC repairs |
| (f) | 10,000.00 | (to date) | maintenance of truck dock and brick work at rear of Leased Premises |
| (g) | 40,000.00 | (to date) | roof repairs to date |
| (h) | 30,000.00 | (1981–82) | attorneys fees |
| (i) | 10,000.00 | (1981) | architecture fees |
| (j) | 3,000.00 | (1981) | engineering fees |
| (k) | 3,500.00 | (to date) | accountant fees |
| (l) | 445,082.97 | (1981–82) | CAM and Taxes unpaid by Goldblatt or New Tenant |
| (m) | 352,977.61 | (1981–1/83) | fixed base rent unpaid by Goldblatt and not paid by New Tenants |
| (n) | 750,000.00 | (1981–84) | interest expenses |
| (o) | 25,000.00 | | future brick repairs |

Each said expense proximately resulted from Goldblatt's default and surrender of premises, and the consequent need to repair, remodel, and relet. None constituted long term capital expenditures resulting in capital improvements benefiting lessors or improving the property value beyond its value when occupied by Goldblatts.

65. During the period from June 16, 1981 through June 15, 1984, Arlington collected at least $1,896,099.60 in rental, common area maintenance and real estate taxes from the new tenants. This was less than the $2,307,791.60 in reserved rent for that period under the Goldblatt lease. Consequently, Arlington did not obtain any "net profit" from such new tenants under Arlington's court approved Agreement with Goldblatt [Finding No. 14(a) and 14(b)]. There was no accounting report or procedure followed by the parties as provided in that Agreement.

## CONCLUSIONS OF LAW

1. This Court has core jurisdiction to adjudicate claims disputes under 28 U.S.C. § 157(b)(2).

2. Arlington timely filed its claim for damages suffered by it as a result of Goldblatt's abandonment of the Leased Premises and default under the Lease ("Arlington's claim").

3. The hard core amounts of Arlington's present damage claims total $2,939,-000.00.

4. The said total claim of $2,939,000.00 does not include damages Arlington may suffer in the future as a result of Goldblatt's surrender of the Leased Premises and default under the Lease from Arlington's payment of (i) possible future interest costs on the monies borrowed, (ii) possible rental commissions upon future releting of the Leased Premises, (iii) possible loss of Reserved Rent in the event the New Tenants or other new tenants do not stay in the Leased Premises through the year 2003 and pay the Reserved Rent under the Lease, (iv) possible repairs and maintenance of the Leased Premises, (v) possible additional engineering fees, attorneys fees, and architectural expenses incurred in placing the Leased Premises in condition to relet to tenants at the end of the New Tenants' leases, and (vi) possible default by

Castle in repayment of the remainder due on the $130,000 loan to it.

5. In accordance with Section 502(b) of the Bankruptcy Code, the claim of Arlington is allowable except to the extent that such amount exceeds $2,658,216.59 which is the amount of (a) the Reserved Rent under the Lease for the three year period following June 15, 1981, plus (b) the Reserved Rent under the Lease unpaid as of June 15, 1981. *See Colliers on Bankruptcy*, Sec. 502.02, at 59–61 (15th Ed.1981).

6. Rent reserved under the Lease includes fixed base rent, taxes and common area maintenance expenses to be paid to Arlington; such compensation is required to be paid to Arlington for Goldblatt's use of the Leased Premises. *See Elliott v. Leounes*, 39 B.R. 575 (Bankr.D.Del.1984); *Waldschmidt v. Appleton Investment Company*, 13 B.R. 264 (Bankr.E.D.Wis. 1981).

7. Arlington suffered losses in excess of $2,939,000 as a result of Goldblatt's abandonment and default under its lease with Arlington. Because Arlington's damages exceed the maximum allowable claim in this case under Section 502(b)(6) of the Bankruptcy Code ("Code"), Arlington's claim must be reduced and allowed in an amount equal to the statutory maximum of $2,658,216.59.

8. Apart from objections to some of the damage claims, the objection of the Official Committee of Unsecured Creditors (the "Committee") to Arlington's claim is based upon a legal ground. The Committee argues that damages a lessor is entitled to upon debtor's termination of lease, apart from unpaid rent due as of the bankruptcy filing, is rent for three years less rent actually received from new tenants during that period plus costs expended in obtaining the new tenants.[1]

■ 9. A claim, as defined under Section 101(4) of the Bankruptcy Code, is the "right to a payment, whether ... reduced to judgment, liquidated, unliquidated, fixed, contingent, mature, unmature, disputed, undisputed, legal, equitable, secured or unsecured." A lessor's right to payment from a debtor is governed by the provisions of the lease or other contract between the lessor and debtor. *See Collier on Bankruptcy*, Sec. 502.02 at 502–57, (15th Ed 1981) and *In the Matter of W.T. Grant Company*, 13 B.R. 198 (S.D.N.Y.1981). If the lease, or other contract, has a damage or indemnity covenant which takes effect upon termination or breach of the lease, the lessor's damages are calculated in accordance with those provisions.

■ 10. In this case, Arlington's right to payment, and the nature of its claim has been fixed by the terms of Goldblatt's lease (the "Lease"), the June 16, 1981 agreement between Arlington and Goldblatt (the "Agreement"), and also by this Court's order approving and authorizing execution of the Agreement. Section 502 of the Code does not proscribe which losses Arlington is entitled to recover, as the Committee impliedly suggests.

"Federal law provides no formula for ascertainment of the allowable damages [for a lessor]. It merely qualifies and limits the lessor's claim to a maximum ... *See City Bank Farmers Trust Company v. Irving Trust Company*, 299 U.S. 433, [57 S.Ct. 292, 81 L.Ed. 324] (1937)." *See C.D. Stimson Co. v. Porter*, 195 F.2d 410, 413 (9th Cir.1952).

11. Under the Lease (paragraph 28), upon default, abandonment or termination of the Lease, all of Goldblatt's obligations continued. Goldblatt thereby remained liable for (i) all payments of fixed rent, common area maintenance expenses, taxes and utilities, (ii) all repairs to the premises, structural and non-structural, (iii) keeping the premises in good condition, (iv) maintenance, repair and replacement of all heat-

---

**1.** Thus, the Creditors compute the statutory maximum as follows:

| | |
|---|---|
| Reserved rent 6/15/81 to 6/15/84 | $2,307,791.60 |
| Rent actually received from new tenants | 1,896,099.60 |
| | $ 411,412.00 |

| | |
|---|---|
| Expenses directly incurred in reletting | $ 417,217.80 |
| Rent unpaid prior to bankruptcy filing | 350,424.93 |
| Total claim | $1,179,095.29 |

ing, ventilating, air conditioning, electrical and other mechanical systems on the premises, and (v) all repairs to place the premises in condition so that it can be relet to others.

12. Under the Agreement between the parties (paragraph 3), Arlington is entitled to a claim for all damages, losses and expenses suffered as a result of Goldblatt's abandonment of the leasehold premises, including, but not limited to, such damages, losses and expenses suffered by reason of (i) Goldblatt's nonpayment of fixed rent, general taxes, and common area maintenance expenses, (ii) Arlington's liability for and its expenditure of substantial sums for, including but not limited to, the remodeling and restructing of the premises, both interior and exterior, to make the premises suitable to lease to new tenants, (iii) interest on all amounts owing under the lease unpaid by Goldblatt, (iv) interest on all amounts borrowed by Arlington to pay for remodeling and restructuring of the premises, (v) brokerage commissions paid in connection with obtaining new tenants, and (vi) attorneys fees.

13. The Lease and Agreement itemize those damages to which Arlington is entitled. State law regarding losses upon breach of a lease is irrelevant. State law is applicable only when the lease or other contractual arrangement between the landlord and tenant does not itemize the damages the landlord is entitled to recover. *See C.D. Stimson Co. v. Porter,* 195 F.2d 410, 413 (9th Cir.1952) (State law is relevant only if there is no contractual formula for damages); *In re City Stores Company,* 23 B.R. 201 (S.D.N.Y.1982) (lease held to govern damages allowed as a part of the landlord's claim).

14. A lessor's damages are seldom capable of exact proof. Consequently, it is sufficient to establish facts and circumstances to enable a court to estimate, based upon its judgment, the amount of damages incurred. *See C.D. Stimson v. Porter, supra* at 414. In this case, however, the exact amount of most of Arlington's damages are known and an estimate is not needed. This Court has found that Arlington incurred damages of at least $2,939,000.00 as a result of Goldblatt's abandonment and default under the Lease. But for the ceiling set forth in Section 502(b)(6), Arlington would be entitled to a claim for the full amount of its damages.

15. The purpose of Bankruptcy Code Section 502(b)(6) and its predecessors is two-fold. First, it ensures that non-lessor creditors recover more than the minimal portion of their claims they would receive if landlord claims resulting from termination of long term leases were allowed in full. Second, it ensures that lessors obtain a reasonable portion of the damages they suffered as a result of an abandonment of a lease by a bankrupt.

16. As the Supreme Court explained in *Kuehner v. Irving Trust Co.,* 299 U.S. 445, 455, 57 S.Ct. 298, 303, 81 L.Ed. 340 (1937),

What the statute does, is to assure at least three full years rent to a landlord whose possible loss may exceed that amount, evidently upon the theory that with such an allowance the landlord stands a reasonable chance of restoring himself to as good a position as if the lease had not been terminated.

Therefore, under 502(b)(6), if the damages incurred by a landlord are greater than the limit set forth in the statute, the landlord's claim is allowed in an amount equal to the full statutory limit. *See In re Stewart's Properties, Inc.,* 41 B.R. 353 (D.Hawaii 1984) (where damages exceed the statutory limit, the landlord is entitled to a claim equal to the entire amount of the limit); *In the Matter of Aristo Foods, Inc.,* 1 B.C.D. 345 (W.D.Mo.1974) (a lessor's actual damages are first calculated; if they exceed three years reserved rent plus rent unpaid when the bankruptcy began, the lessor's claim is reduced and allowed in that amount).

17. Arlington and the Committee agree that the ceiling under Section 502(b)(6) above which Arlington's claim cannot be allowed is $2,658,216.59. Because the amount of the damages Arlington suffered

as a result of Goldblatt's abandonment of the Lease exceeds that ceiling, Arlington is entitled to an allowed claim in an amount equal to the full statutory limit.

█ 18. The Committee claims that the rent received by Arlington during the three year period, referred to in Section 502, must be subtracted from the statutory limit of $2,658,216.59. A primary support for that position is *In the Matter of Parkview-Gem, Inc.*, 465 F.Supp. 629 (W.D.Mo.1979).

In *Parkview-Gem*, the court's discussion of that subject follows:

> During the three-year period, however, [the landlord] collected rent from the new tenant totaling $1,922,312.00. The difference between what [the debtor-tenant] would have paid and what the new tenants paid is $1,377,067.00. This amount is clearly allocable under the statute and there is no dispute on that point. *Id.* 465 F.Supp. 629, 633.

The court went on to discuss extensively other damage issues, but the calculation as to which the court there said "there is no dispute" was not directly in issue. Other issues were extensively discussed. The Committee correctly notes that *Parkview-Gem* rested in part on *C.D. Stimson Co. v. Porter*, 195 F.2d 410 (10th Cir.1952). But the reliance on *Stimson* rested on the finding there that costs of subdividing premises where needed to relet should be added to the damages, as costs of mitigation generally are. *Parkview-Gem, Id.*, 465 F.Supp. at 637–38, citing *Stimson, Id.*, 195 F.2d at 414.

Such authority does not provide any real substance for Goldblatt's position and computation of the rent collected from new tenants in the instant case so as to deduct same from the reserved rent for that period. *Parkview-Gem* does provide authority for adding to the damage costs all costs of mitigation which landlord spent in an effort to relet, and of course the same was accepted here.

Thus the assertion of *Parkview-Gem* is not persuasive, and appears contrary to the language of Section 502(b)(6) and other precedent. *See e.g. Overmeyer Co., Inc.*, 10 C.B.C. 17 (S.D.N.Y.1976) (rent received reduces the amount of damages otherwise suffered, not the maximum amount in which a claim may be allowed.).

19. As previously discussed, Arlington is entitled to a claim for all damages specified under the provisions of the Lease and Agreement. While Section 502(b)(6) limits the amount at which a landlord's claim can be allowed, it does not declare a damage formula. *See Overmeyer Co., Inc., supra.* The reduction of damages by the amount of rent received would be appropriate only if Arlington had first included in its claims all rent due under the Lease, whether or not the premises had been relet and that rent subsequently paid. Arlington made no such claim, nor did it profit from the reletting by receiving more than Goldblatts would have paid.

20. *Oldden v. Tonto Realty Corporation*, 143 F.2d 916 (2d Cir.1944), cited by the Committee does not support its position regarding reduction of the statutory maximum of Arlington's allowable claim by the rent it received. The court in *Oldden* acted in accordance with precedent set forth hereinabove. That court first calculated the amount of all damages suffered by the landlord as a result of the bankrupt's abandonment of the leased premises. Next, the court calculated the statutory limit above which the claim could not be allowed. Because the total amount of the damages exceeded the statutory limit, the lessor's claim was reduced and allowed in an amount equal to the full amount of the statutory limit. Part of the claim was secured by a security deposit held by the lessor. As the security deposit satisfied a portion of the lessor's claim in full, the lessor's maximum allowable claim was reduced by the amount of the satisfied portion of the claim and the balance was the lessor's allowed unsecured claim.

21. Arlington has no such security on deposit here. The rent received from the new tenants was not property of Goldblatt given to satisfy any losses Arlington suffered. The rent Arlington received from

the new tenants reduced the damages Arlington would have otherwise suffered from Goldblatt's nonpayment of rent. The benefits Arlington received from this rent have in effect already been credited to Goldblatt in Arlington's calculation of its damages, by omitting any claim for rent due from Goldblatts which it has largely but not entirely received from the replacement Tenants. The Committee cannot get a second credit for that rent by deducting it from the statutory maximum.

22. Arlington suffered damages in excess of $2,939,000, which did not include expenditures for capital improvements. The maximum amount that can be allowed under Section 502(b)(6) is $2,658,216.59, so there is no need to analyze possible additional damage claims that may argueably have included capital expenditures. Arlington is entitled to an allowed claim for $2,658,216.59. By separate Judgment Order, the claim will be allowed in that amount.