**In re FARLEY, INC., Debtor.**

**Bankruptcy No. 91 B 15610.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Oct. 2, 1992.

Herbert S. Edelman, Howard A. Becker, Kaye Scholer Fierman Hays & Handler, New York City, Mark K. Thomas, Katten Muchin & Zavis, Chicago, Ill., Kenneth Greenbaum, Farley, Inc., Chicago, Ill., Vice–President and Gen. Counsel, for debtor Farley.

Dean Harvalis, Office of the U.S. Trustee, Chicago, Ill.

John Kneafsey, Nisen & Eliott, Chicago, Ill., for U.S. Diecasting & Development Co., Inc.

## MEMORANDUM OPINION ON DEBTOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT

JACK B. SCHMETTERER, Bankruptcy Judge.

This matter is before the Court on motion of Debtor Farley, Inc. ("Farley") for partial summary judgment pursuant to Fed.R.Civ.P. 56(d) (Fed.R.Bankr.P. 7056). Debtor seeks judgment limiting the amount U.S. Die Casting and Development Co. ("U.S. Die") can claim against Farley for damages resulting from termination of a lease agreement between them. The order is sought pursuant to 11 U.S.C. § 502(b)(6) of the Bankruptcy Code. For reasons set forth below, the request for final partial judgment must be denied. However, pursuant to Fed.R.Civ.P. 56(d), the undisputed facts will be found, based upon which the Court will enter an interlocutory order limiting the bankruptcy claim of U.S. Die to the statutory cap as computed under 11 U.S.C. § 502(b)(6).

This cap will apply to limit the U.S. Die bankruptcy claim in the event that Farley is found to be liable for damages arising out of the lease termination, in whatever forum such claim for damages is ultimately liquidated. Formal findings of facts as to which there is no genuine issue will be entered, facts on which the amount of the damage cap figure is based. Consequently, the U.S. Die bankruptcy claim is found to be subject to a statutory maximum of $5,779,000, pursuant to 11 U.S.C. § 502(b)(6).

### UNCONTESTED FACTS

Farley has submitted a statement of uncontested facts as required by Local District Court Rule 12 (adopted by the District Court as a rule in bankruptcy), and U.S. Die has not challenged Farley's factual assertions in its Rule 12 response. The parties also filed a joint pre-trial Statement that corroborates the Rule 12 factual statements. In preparation for trial, the latter statement lists facts and documents which are stipulated to by the parties, as well as contested legal and factual issues for the court to decide. Based on the pre-trial statement and other submissions of counsel, certain facts are undisputed:

On April 1, 1989, U.S. Die leased a portion of an aluminum die casting plant in Sheffield, Alabama to Farley, Inc. The initial term of the lease was seven years. Lease ¶ 2, Joint Pre-trial Ex. F. Lessee was given a right to renew for an additional seven years, id., but a $10,000,000 penalty was added in the event that lessee did not exercise that right. Id.

As to rent due, the lease provided in relevant part:

... For years two (2) through seven (7), the minimum rental shall be Four Million and ⁰⁰⁄₁₀₀ Dollars ($4,000,000.00) per annum ... For the first seven (7) year term, Tenant will be credited with Two Hundred Seventy–Five Thousand and ⁰⁰⁄₁₀₀ Dollars ($275,000.00) per year for prepaid rent ... [For] years two (2) through seven (7) the minimum rental will be Three Million Seven Hundred Twenty–Five Thousand and ⁰⁰⁄₁₀₀ Dollars ($3,725,000.00). The monthly rental payments set out above reflect the credited amount for prepaid rent.

*Id.* at ¶ 4(a). The agreement further provided,

It is the intention of the Owner and the Tenant that the rent herein specified shall be net, net to the Landlord in each year during the term of this lease, that all costs, expenses, and obligations of every kind relating to the Leased Premises (except as otherwise specifically provided in this lease) which may arise or become due during the term of this lease shall be paid by the Tenant (except as herein provided ...).

*Id.* at ¶ 19.

The lease agreement also provided for the lessee Farley to incur other financial obligations. Paragraph 6 required it to dispose of all wastes that it generated, maintain the premises and all leased equipment therein, insure the premises against risk of personal injury or property damage liability, and pay taxes related to ownership of the property or operation of a business thereon. *See, e.g., Id.* at ¶ 6(b) (duty to maintain premises). The lease agreement also provided for lessee to make capital expenditures:

... [I]t is expected and required that Tenant will make expenditures for capital improvements to the Leased Premises and Leased Equipment of a minimum of $2,000,000.00 per year. All such improvements will remain the property of the landlord ... It is further understood by the parties that day-to-day normal reoccurring maintenance cost is excluded

from the annual ... ($2,000,000) expenditure requirement.

*Id.* at ¶ 6(c).

U.S. Die recognized the existence of environmental problems on the leased premises, and agreed to indemnify lessee for liability due to hazardous wastes that were deposited on the premises before the lease was executed. *Id.* at ¶ 7. U.S. Die further represented that these wastes were being treated in accordance with federal environmental protection laws. *Id.* at ¶ 9(e).

The parties agreed that the lease would be governed by Alabama law. *Id.* at ¶ 15(a).

On or about July 20, 1990, Farley entered into a lease assignment and assumption agreement with the Doehler–Jarvis Limited Partnership ("Doehler–Jarvis") with regard to this plant. Joint Pre-trial Ex. G. U.S. Die consented to this assignment on July 23, 1990. Joint Pre-trial Ex. I. However, its letter of consent stated that, "it is understood that by executing this Consent that the undersigned does not release Farley, Inc., the named Lessee, and the aforesaid Farley, Inc. remains bound and liable under all the terms and conditions of the aforesaid Lease." *Id.* Farley agreed to this condition by a letter to U.S. Die stating, "[w]e hereby acknowledge that your consent to the assignment ... will not release us from liability under said lease." Joint Pre–Trial Ex. K.

Doehler–Jarvis occupied the leased premises until February 29, 1992 when it vacated the premises and ceased making any payments to U.S. Die as required by the lease and assignment. U.S. Die has been in possession of the premises from that time. U.S. Die contends that the surrender of the premises constituted a breach of the lease agreement. It also alleges that Doehler–Jarvis "wrongfully and clandestinely removed from the premises, items of property belonging to plaintiff...." Amended Proof of Claim at ¶ 24.

U.S. Die seeks to recover $41,579,412 plus attorneys fees and cleaning expenses

from Farley as compensation for the alleged breach and conversion. U.S. Die reaches this figure by claiming the following damages:

| | |
|---|---:|
| 1 month rent (end of year 2) | $ 310,416 |
| 4 years minimum rent (to the end of the initial term) (4,000,000 × 4) | 16,000,000 |
| Required capital expenditures (less payments already made ($2,000,000/year × 7 years − payments (654,130 + 1,099,708))) | 12,246,162 |
| Penalty for non-renewal | 10,000,000 |
| Insurance ($30,000/year) | 122,500 |
| Utilities (for vacant building) ($13,000/month) | 637,000 |
| Reassembly of Equipment taken apart by Doehler–Jarvis | 600,000 |
| Equipment taken by Doehler–Jarvis | 260,000 |
| Security (35,000/year) | 142,917 |
| Maintenance (30,000/year) | 122,500 |
| Building Engineer (50,000/year) | 204,167 |
| Personal Property Taxes assessed by the state of Alabama | 750,000 |
| Rent Tax (45,000/year) | 183,750 |
| | $41,579,412 |

This calculation includes all of the lessee's asserted obligations for the four years and one month between February 29, 1992 (when Doehler–Jarvis left the premises) and March 30, 1996 (when the lease expires by its terms). U.S. Die also contends that the penalty for non-renewal must be included as part of its damages.

On July 24, 1991, an involuntary petition under Chapter 7 of the Bankruptcy Code was filed against Farley in this Court. On September 24, 1991, Farley voluntarily converted the case to one under Chapter 11, and has continued to operate as debtor-in-possession from that date to the present.

On April 16, 1992, U.S. Die filed a two-count Amended Proof of Claim seeking to recover the above-listed damages. Count I alleges that Farley is liable for these damages as guarantor of Doehler–Jarvis' obligations under the assigned lease, and Count II alleges that Farley is liable for these damages as lessee.

Farley not only denies the damages, but pleads two affirmative responses to this claim. First, Farley alleges that U.S. Die misrepresented the extent of environmental hazards existing on this property when the lease was executed, and asserts that Doehler–Jarvis was entitled to terminate the lease when it discovered these hazards. Therefore, it denies having any liability under either count of the claim. Second, in the event that Farley is liable for the asserted breach, it seeks to limit the amount of damages allowable in bankruptcy by the statutory cap on damages provided in § 502(b)(6) of the Bankruptcy Code, Title 11 U.S.C. The instant motion rests on the latter theory.

On November 21, 1991, the Court granted Farley's motion to extend its time to assume or reject its leases pursuant to 11 U.S.C. § 365(d)(4). On August 12, 1992, the Court entered an interlocutory order stating, "to the extent the debtor's lease from U.S. Die Casting of the Sheffield, Alabama manufacturing facility is an executory contract, the same is deemed rejected effective this date."

## DISCUSSION

### Jurisdiction

This matter is before the Court pursuant to 28 U.S.C. § 157 and is referred here under Local District Court Rule 2.33. Subject matter jurisdiction lies under 28 U.S.C. § 1334, and this is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O).

### Standards for Partial Summary Judgment

The primary purpose for granting a summary judgment motion under Fed.R.Civ.P.

56 (Fed.R.Bankr.P. 7056) is to avoid unnecessary trials when there is no genuine issue of material fact in dispute. *Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Assoc. of Indianapolis,* 806 F.2d 146, 149 (7th Cir.1986). Thus, summary judgment should be granted when the pleadings, admissions on file, and other pre-trial documents show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986).

■ The movant bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. In determining whether this burden has been met, the evidence must be viewed in the light most favorable to the opposing party. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. at 2511; *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355. Once the moving party has met its *prima facie* burden, the opposing party must, by affidavit or otherwise, demonstrate the existence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553.

A ruling on the statutory cap issue presented here cannot entirely dispose of either count of U.S. Die's claim. Movant only seeks a ruling on its statutory cap defense (that U.S. Die's claim is limited by § 502(b)(6)), and it denies having any liability at all for the asserted lease termination. Therefore, the instant motion is governed by Fed.R.Civ.P. 56(d), as applied through Fed.R.Bankr.P. 9014 and 7056(d).

Rule 56(d) provides,

**Case Not Fully Adjudicated on Motion.** If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, ... shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action, the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

■ The Court may not enter a final "partial summary judgment" under Rule 56(d) when such judgment would not entirely dispose of the claim or any count therein. *Commonwealth Insurance Co. of New York v. O. Henry Tent & Awning Co.,* 266 F.2d 200, 201–202 (7th Cir.1959), *citing Biggins v. Oltmer Iron Works,* 154 F.2d 214, 216–17 (7th Cir.1946); *Capitol Records, Inc. v. Progress Records Distrib.,* 106 F.R.D. 25, 28 (N.D.Ill.1985); *In re Network 90°, Inc.,* 98 B.R. 821, 823 (Bankr.N.D.Ill. 1989), *aff'd* 126 B.R. 990 (N.D.Ill.1991).

■ However, in this case, an order that is interlocutory and in the nature of a pre-trial order may be entered. *See Biggins,* 154 F.2d at 217 ("when the court is confronted with such a motion [for a partial summary judgment on a portion of a claim], it is authorized only to make an 'order' as to the non-controverted facts, 'including the extent to which the amount of damages or other relief is not in controversy' "). The standard for granting such a motion was set forth in *Capitol Records,* 106 F.R.D. at 29–30:

A fair reading of Rule 56(d), then, is that it does not allow a party to bring a motion for a mere factual adjudication. Rather, it allows a court, on a proper motion for summary judgment, to frame and narrow the triable issues if the court finds that such an order would be helpful to the progress of the litigation.

Courts have differed on whether an order may be entered when only certain damages issues will be disposed of by the motion. In *Leonard v. Socony–Vacuum Oil Co.,* 130 F.2d 535 (7th Cir.1942), the plaintiffs filed a one-count complaint which list-

ed five elements of damages. The district court ruled, as a matter of law, that plaintiff was not entitled to recover on two of those elements. Appeal followed. The Seventh Circuit dismissed the appeal, finding that, "[i]n essence, defendants' motion was nothing more than one to strike certain matters and the judgment only interlocutory,—a pretrial order determining for the purposes of the trial a legal contention affecting only certain elements of damages." *Id.*, at 537.

In *In re Atlantic Container Corp.*, 133 B.R. 980 (Bankr.N.D.Ill.1991) (Coar, J.), a debtor filed a motion for partial summary judgment, seeking *inter alia* to limit a landlord's claim in bankruptcy by the cap provided in 11 U.S.C. § 502(b)(6). Decision on that motion could not finally dispose of the claim or any count therein at that stage of proceedings. The bankruptcy judge nonetheless entered an order stating, "Resolution of these issues by summary judgment may significantly limit the scope of subsequent evidentiary proceedings, thereby conserving judicial time and resources. Partial summary judgment with regard to these ... issues, is therefore appropriate." *Id.* at 984. *See also Matter of Interco, Inc.*, 137 B.R. 1003 (Bankr.E.D.Mo.1992) (limiting recoverable damages by the terms of § 502(b)(6)), and *In re Johnson*, 117 B.R. 461 (Bankr.D.Minn.1990) (entering an order which ruled on the applicability of § 502(b)(7) statutory cap to an employee's claim for damages).

Other courts have refused to issue such orders. *See Strandell v. Jackson County*, 648 F.Supp. 126 (S.D.Ill.1986) (defendants had a sovereign immunity defense for damage claims beyond a set amount, but the court refused to enter partial summary judgment on that defense); *Arado v. General Fire Extinguisher Corp.*, 626 F.Supp. 506 (N.D.Ill.1985) (denying partial summary judgment motion for a ruling on certain prayers for damages within a single count); *Capitol Records*, 106 F.R.D. 25 (it was undisputed that defendant owed plaintiff $9,009.99 of the $17,571.50 asked for in the complaint, but the court refused to enter a judgment order finding plaintiff liable for that $9,009.99 under Rule 56(d)).

In light of Seventh Circuit authority previously cited, partial summary judgment cannot be entered here. Authority to the contrary will not be followed. However, entry of an interlocutory order is both possible and appropriate under the circumstances presented. The entry of such an interlocutory order here will conserve judicial time and resources, and the resolution of the factual and legal matters involved will significantly advance both the litigation surrounding U.S. Die's claim and Farley's reorganization process. Although claims estimation for voting purposes has not yet been requested for the U.S. Die claims, the ruling here will facilitate that process. Accordingly, the legal issues that arise out of uncontested facts presented will be addressed, and an interlocutory order entered thereon.

*Applicability of 11 U.S.C. § 502(b)(6)*

Section 502 of the Bankruptcy Code provides in relevant part:

(a) A claim ... is deemed allowed, unless a party in interest ... objects.

(b) ... if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim ... and shall allow such claim in such amount except to the extent that—

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property such claim exceeds—

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years of the remaining term of such lease, following the earlier of—

(i) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

(B) any unpaid rent due under such lease without acceleration, on the earlier of such dates;

....

The purpose of § 502(b)(6) is to compensate the landlord for loss due to the

breach of a lease, yet allow other creditors to recover a reasonable amount by capping the amount the landlord can receive. *Oldden v. Tonto Realty Corp.*, 143 F.2d 916, 920 (2d Cir.1944);[1] *Matter of Interco, Inc.*, 137 B.R. at 1005; *In re Communicall Central, Inc.*, 106 B.R. 540, 543 (Bankr.N.D.Ill. 1989). *See also* S.Rep. 95–989, 95th Cong., 2nd Sess. 63, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5849 ("[Section 502(b)(6)] was designed to compensate a landlord for his loss while not permitting a claim so large (based on a long term lease) as to prevent other unsecured creditors from recovering a dividend from the estate").

Section 502(b)(6), therefore, acts as an equalizer between the claims of landlords and those of other creditors by allowing landlords to be compensated for loss due to the breach without receiving a windfall.

> ... Permitting a landlord to consume a substantial part of the property for his benefit is unfair in light of the fact that the landlord has the opportunity to mitigate his damages by reletting. Not only has the landlord been compensated up until the date of the bankruptcy petition but also reacquires his original assets upon bankruptcy.

*In re Thompson*, 116 B.R. 610, 613 (Bankr. S.D.Ohio 1990), citing *In re Rodman*, 60 B.R. 334 (Bankr.W.D.Okl.1986).

■ For purposes of applying § 502(b)(6) to a landlord's claim, it is not legally relevant whether the debtor is defined as "tenant" or as "guarantor" of the lease. Section 502(b)(6) does not explicitly limit claims of a landlord against lease guarantors. The statutory language only limits the claims of a "lessor for damages from the termination of a lease." However, reading into this provision a distinction between tenants and guarantors is unwarranted, since either tenant or guarantor can be liable for "damages from the termination of a lease." From the language of § 502(b)(6), it is apparent that it is equally applicable to lessees and guarantors. *Old-*

*den v. Tonto Realty Corp.*, 143 F.2d at 921 ("the guaranty is a secondary obligation, it must be subject to the same limitations as the primary"); *Interco, Inc.*, 137 B.R. at 1005–1006 ("[t]he purpose of 502(b)(6) is to compensate the landlord fairly while protecting other creditors. This rationale is applicable whether the debtor is the tenant or the guarantor of the lease"); *Thompson*, 116 B.R. at 613. Cf. *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) ("plain meaning of legislation should be conclusive, except in rare circumstances [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters").

Accordingly, to the extent that U.S. Die's claim is based on any breach of its lease agreement, that claim is limited by the cap set out in § 502(b)(6).

### Computation of Damages Allowable under § 502(b)(6)

This lease was rejected post-petition after Doehler–Jarvis abandoned the premises and ceased paying rent on February 29, 1992. Farley rejected the lease (to the extent it is found to be an executory contract) on August 12, 1992. The application of the § 502(b)(6) formula for limiting a landlord's damages for a post-petition rejection of a lease is explained in Ginsberg, *Bankruptcy: Text, Statutes, Rules*, § 7.04[a] (2nd Ed.1991):

> The formula amount would give the landlord a claim for 15% of the total rent called for by the lease for the remainder of its term after the date of the petition or a claim for the amount of rent (without acceleration) due in the year after the petition, whichever is greater.

To make this calculation, one must determine the "damages resulting from the termination of a lease" and define what constitutes "rent reserved". Such determinations define the damages being capped and give a basis for calculation of the claim cap.

---

**1.** While *Oldden* was analyzing § 63 of the Bankruptcy Act, its analysis is applicable to the § 502(b)(6), the Code's successor to § 63. *Com-* *municall Central*, 106 B.R. at 543 ("Section 502 ... codified the holding in the controlling case of *Oldden* ...").

Section 502(b)(6) limits "only those damages which the lessor would have avoided but for the lease termination." *Atlantic Container Corp.*, 133 B.R. at 987. In this case, certain asserted damages do not relate to termination of the lease. U.S. Die has alleged an act of conversion by claiming that Doehler–Jarvis wrongfully removed certain items owned by U.S. Die. Such alleged conversion could have occurred independently of the lease termination. Also, the taxes assessed by Alabama may be for a period before the termination of the lease. Therefore, the Court cannot find on this record that, as a matter of law, the $260,000 claimed for lost equipment or the taxes assessed by Alabama must be capped by § 502(b)(6), if found to have merit. *See Atlantic Container, id.* (damages for breach of lease covenants that are not prospective in nature are not limited by § 502(b)(6)).

All other components of damage alleged by U.S. Die purport to arise out of termination of the lease. Thus, all other components of asserted damage may be capped by § 502(b)(6). This includes the residual guarantee clause, i.e. $10,000,000 penalty imposed by the lease agreement in the event that lessee fails to renew for another seven year term. *In re Storage Technology Corp.*, 77 B.R. 824, 825 (Bankr. D.Col.1986).

"Rent reserved" under 11 U.S.C. § 502(b)(6)(A) is any payment specifically denominated as rent. It includes any payments that relate directly to or increase the value or worth of the property, and are fixed, regular payments. *See In re Hecks*, 123 B.R. 544, 546 (S.D.W.Va.1991) (rent reserved includes minimum rent, real estate taxes, insurance and common area maintenance fees but did not include costs incurred when lease was terminated such as new keys, electrical repairs, and a new sign).

The lease provides for a minimum annual rental payment of $3,725,000. However, rent reserved in a "triple" net lease, such as the one in this case, includes taxes and insurance premiums—$24,000 and $30,000 respectively. Thus, these items must be included in calculating "rent reserved".

Farley contends that the annual capital improvement fee of $2 million is not a component of rent. In this it is wrong for several reasons. The lease makes clear that the capital improvement fee was to be paid as consideration for the right to lease the premises. Also, as specified in the lease, that fee was to be paid to enhance value of the leased property. Finally, those payments were fixed and periodic in nature.

Farley argues otherwise, pointing to ¶ 6(g) of the lease agreement which states:

The requirement for the expenditure of $2,000,000.00 per annum for capital improvements to the Leased Premises and Leased Equipment as set out in Paragraph 6(c) above, shall be cumulative in that if Tenant should expend $4,000,000.00 in the third year of the lease term for said capital improvements, then there would be no requirement to expend any sum during the fourth year so long as Tenant has spent Eight Million Dollars and 00/100 ($8,000,000.00) over the course of the first four (4) years....

However, this clause merely provides that, if the lessee pays more than the required amount of capital improvement fees in one year, then lessor will credit that excess to the next year. This clause cannot reasonably be interpreted to mean that the fee is not fixed in amount or periodic in nature.

Farley also cites *In re Goldblatt Bros., Inc.*, 66 B.R. 337, 346 (Bankr.N.D.Ill.1986), to support its argument. The lease in *Goldblatt* included a clause which required lessee to "make all repairs, alterations, replacements, additions, and improvements of every nature and description". 66 B.R. at 339. However, when calculating "rent reserved" under § 502(b)(6), only the three elements of rent in a triple-net lease, i.e. fixed rent, common area maintenance fees, and real-estate taxes, were included there. *Id.* at 340. While the lease in the instant case is also characterized as a triple-net lease, the capital improvement fee is a different obligation from the maintenance requirement of the lease in *Goldblatt*. The

capital improvement fee here has a defined amount and must be paid on a periodic basis. Furthermore, ¶ 6(b) of the instant lease creates a duty to maintain the premises that is separate and apart from the duty to pay capital improvement fees. Therefore, *Goldblatt* is clearly distinguishable.

The § 502(b)(6) statutory cap is therefore calculated as follows: "Rent reserved" for one year would be $5,779,000. This figure is calculated by adding together rent ($3,725,000), real estate taxes ($24,000), insurance ($30,000), and the yearly capital improvement fee ($2,000,000). The full rental obligation from the petition date to the end of the lease term is approximately $26 million. Fifteen percent of that amount is only $3,900,000. The larger number of these two figures is the amount of rent reserved for one year, $5,779,000. Thus, this is the applicable amount of the statutory cap on the claim of U.S. Die.

*Miscellaneous Issues*

Farley argues that U.S. Die has attempted to create factual issues where none exist. Indeed, it does appear that various "red herring" issues have been presented that distract rather than enlighten. First, U.S. Die's contention that Farley's motion is premature because Farley has not rejected the lease agreement is moot since Farley rejected this lease on August 12, 1992.

There is an issue about whether the lease was executory and unexpired as to Farley once it assigned its leasehold interest to Doehler–Jarvis. *See, e.g., In re Brooklyn Overall Co., Inc.,* 57 B.R. 999, 1004 (Bankr. E.D.N.Y.1986) (although debtor-lessee remained contingently liable for the assignee's obligations under the lease, it was held that "assignment terminated the landlord-tenant relationship. Consequently ... no executory contract or true unexpired lease existed for the trustee to assume or reject under § 365(d)(1)"). However, this issue need not be decided in order to decide the instant motion, and consequently it is not addressed.

■ U.S. Die also suggests that discovery is required to determine if Farley is solvent and whether terminating the lease

would give Farley a windfall. This argument is based on the theory that § 502(b)(6) is only applicable to insolvent debtors. The state of Farley's solvency cannot be determined from the record presented on the instant motion. However, even if Farley were not insolvent, a debtor's solvency has no legal bearing on whether it may terminate a lease agreement.

> As a general rule, a bankruptcy court presented with an application to disaffirm the obligation of an executory contract need determine only whether disaffirmance would be advantageous to the debtor. The burden or hardship which rejection would impose on other parties to such a contract is not a factor to be weighed by the bankruptcy court in ruling upon a debtor's application.

*In re Federated Department Stores, Inc.,* 131 B.R. 808, 811 (S.D.Ohio 1991), (*citing Borman's, Inc. v. Allied Supermarkets, Inc.,* 706 F.2d 187, 189 (6th Cir.), *cert. denied,* 464 U.S. 908, 104 S.Ct. 263, 78 L.Ed.2d 247 (1983)).

*Federated* is cited by U.S. Die to support its contention that a cap should not apply in the case of a solvent debtor. Clearly, the case stands for the opposite proposition. In *Federated,* the District Court ruled that a solvent debtor may reject an unexpired real property lease. *Federated,* 131 B.R. at 812–812. Moreover, that court rejected the landlord's argument that the § 502(b)(6) cap should not be imposed when all other creditors have been paid in full and the only beneficiary of the cap is the debtor. *Id.* at 816. "Under the plain language of the statute, the cap applies. Nothing in § 502(b)(6) suggests that an exception exists where all creditors could be paid in full even if the cap were not applied." *Id.* at 816.

*In re Danrik,* 92 B.R. 964 (Bankr. N.D.Ga.1988), is the only case cited in which the court declined to apply the cap of § 502(b)(6) for equitable reasons. However, the facts of *Danrik* are distinguishable from those presented here. In *Danrik,* the debtor was solvent, had paid all creditors in full, the claim amount was not disproportionately large, and almost all damages as-

serted by the landlord were for money spent in preparing the premises for the tenant. *Id.* at 972. In this case, it is unclear whether Farley is able to pay all its creditors in full. U.S. Die has neither alleged that Farley is solvent nor pointed to any document in the record which indicates that all the other creditors have been or will be paid in full. Moreover, the damages asserted by U.S. Die that are the subject of this motion relate to unpaid future obligations rather than out-of-pocket disbursements that were presented in *Danrik.*

Apart from distinguishing features, the ruling in *Danrik* is properly criticized for failing to apply either the plain language of § 502(b)(6) or prior case law interpreting that section. *See In re Interco, Inc.,* 137 B.R. at 1006 ("[*Danrik*] has not been accepted by courts that have adopted a literal reading of Section 502(b)(6)"); *In re Thompson,* 116 B.R. at 612,

> In *Danrik,* the court held that because of the unusual facts of that case, 502(b)(6) could not fairly be applied to limit a claim against a debtor who guaranteed a lease. This ruling, however, does not comport with a literal reading of 502, nor can it be reconciled with prior case law interpreting this section.

For this reason, the Court does not give *Danrik* weight as persuasive authority. It is irrelevant to analysis under § 502(b)(6) whether Farley is solvent or insolvent, or whether other creditors will receive a windfall at U.S. Die's expense. Congress presumably weighed those considerations, and the § 502(b)(6) formula is the result of that consideration. Therefore, the solvency question is not a material issue of fact which would have any effect on determination of the statutory cap under § 502(b)(6).

## CONCLUSION

This opinion does not decide the amount, if any, of U.S. Die's damages, or the first affirmative defense by Farley. U.S. Die has the ultimate burden of proving that it suffered damages in the asserted amount. The only issue before the Court at this time is the applicability and amount of the § 502(b)(6) statutory formula for damages.

The caps calculated thereunder will only apply in the event U.S. Die establishes liability and damages in excess of that cap. *In re Goldblatt Bros., Inc.,* 66 B.R. at 346.

By order entered separately this day, Farley is directed to submit a draft order that makes findings under Fed.R.Civ.P. 56(d) and limits the bankruptcy claim of U.S. Die to $5,779,000 pursuant to § 502(b)(6) should Farley be found in this or some other forum to be liable for damages in excess of that amount arising out of termination of the lease agreement.