In re Harry A. JOHNSON, Jr., Debtor.

**In re PINEAPPLE MANAGEMENT COMPANY, Debtor.**

**Harry A. JOHNSON, Jr., and Pineapple Management Company, Plaintiffs,**

v.

**Vernon R. BECK, Defendant.**

**Bankruptcy Nos. 3–89–1457, 3–89–3911. Adv. No. 3–89–280.**

United States Bankruptcy Court, D. Minnesota, Third Division.

Aug. 2, 1990.

462

Michael L. Meyer, Robins, Kaplan, Miller & Ciresi, Minneapolis, Minn., for plaintiffs.

William J. Joanis, Vincent J. Fahnlander, Hart Bruner & O'Brien, Leslie S. McEvoy, Fruth & Anthony, Minneapolis, Minn., for defendant.

## ORDER RE: CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding came on before the Court on May 1, 1990, for hearing on the parties' cross-motions for partial summary judgment. Plaintiffs appeared by Michael L. Meyer, general Chapter 11 counsel for Debtor Harry A. Johnson, Jr. ("Johnson") and special counsel for Debtor Pineapple Management Company ("Pineapple"). Defendant ("Beck") appeared by his attorneys, William J. Joanis, Vincent J. Fahnlander, and Leslie S. McEvoy. Upon the moving and responsive documents, supporting affidavits, arguments of counsel, and all of the other files and records in these adversary proceedings, the Court makes the following order.

### FINDINGS OF FACT

The complaint in this adversary proceeding has two separate counts. The subject of these motions is one of the counts. The parties acknowledge that there is no dispute as to the facts which are material to that count. The Court concurs.

Plaintiffs are debtors in possession under Chapter 11 in cases pending in this Court; Johnson filed a voluntary petition for reorganization on April 21, 1989, and Pineapple filed a voluntary petition for reorganization on October 16, 1989. Johnson is a Minneapolis-area plastic surgeon who has also been active in commercial land development and in hotel development and operation. He owns a majority of the outstanding shares of stock in Pineapple, and is the chair of its board of directors. Pineapple holds the management contract for the several hotels in which Johnson has interests.

Beck is a scheduled creditor in both Plaintiffs' bankruptcy cases. He has filed a proof of claim in Johnson's case, asserting a contingent and unliquidated debt owing to him in an amount up to $2,500,-000.00. He has not filed a proof of claim in Pineapple's case. He is a shareholder in Pineapple.

Beck's claims arise out of a contract running between Pineapple and Beck, titled "Employment Agreement," and bearing on its face the effective date of September 1, 1986.[1] Under the contract, Pineapple employed Beck as its president on a year-to-year basis. At the time the parties executed the contract, Beck was a minority (25%) shareholder in Pineapple; he had participated in the formation, capitalization, and incorporation of the company in 1985, having paid $25,000.00 for the stock issued to him. The contract fixed a base salary for Beck, which was to be adjusted upward as long as Pineapple's profits met goals fixed by Pineapple's board. It also fixed Beck's right to various fringe benefits.

The contract provided for the termination of Beck's employment upon specified events, which included: his death; his long-term disability or incapacitation, as defined; Beck's voluntary termination of the employment upon 180 days' notice; and Pineapple's termination of the employment "for cause," as defined in the contract. It required Pineapple to repurchase Beck's stock if Beck's employment were terminated by his death, by either party's nonrenewal at the end of a yearly term, or at Pineapple's instance, for cause. The latter provision fixed the terms of Pineapple's payment obligations for such a repurchase.

In a separately-numbered term, the contract provided that Beck would serve on the board of directors of American Sharecom, Inc., another corporation in which Johnson had substantial interests, at a fixed compensation including a salary and shares of stock in American Sharecom, Inc.

---

1. Beck alleges, and Plaintiffs have not disputed, that Beck commenced his employment with Pineapple in early 1985, that the parties continued negotiating for the final terms of their business and legal relationship until mid-December, 1986, and that the parties agreed to make the otherwise-undated written agreement effective as of September 1, 1986. Beck makes numerous allegations about the reasons and motivations for the delay, which Plaintiffs have not explicitly denied. Neither the delay itself nor its origins, as factual points, are material to the point presently in dispute—which is the amount of Beck's allowable claim in these cases or, at least, the parameters of that amount.

Finally, the contract had standard provisions establishing Pineapple's duty to indemnify Beck; a covenant of noncompetition which was to bind Beck; Beck's duty to maintain the confidentiality of proprietary information; the nonassignability of either party's contractual rights absent the other party's consent; and an entitlement in both parties to recover attorney fees from the losing party in any litigation between them over the enforcement or interpretation of the contract.

In an attachment incorporated into the contract, Johnson, as Pineapple's majority shareholder, executed a consent to and guaranty of the contract. The full language of this provision is:

> The undersigned, Harry A. Johnson, Jr., majority stockholder of [Pineapple], hereby consents to and agrees to guaranty all of the foregoing terms and conditions of the Employment Agreement and [Pineapple's] obligations hereunder.

During his employment by Pineapple, Beck oversaw its operations, and, apparently, devoted considerable effort to managing Johnson's various investments. In mid-March, 1987, Pineapple terminated his employment. At the same time, he was removed as an officer and director of Pineapple.

· Within one month of his termination, Beck sued Johnson and Pineapple in Hennepin County District Court. In his complaint, he prayed for a declaratory judgment establishing the existence of an employment agreement between himself and Pineapple, and· the breach of that agreement and its accompanying personal guaranty by Pineapple and Debtor. As his theories of recovery, Beck alleged breach of contract by both Johnson and Pineapple; Johnson's tortious interference with his contractual relations with Pineapple; Johnson's breach of his majority shareholder's fiduciary duty to Beck as minority shareholder; and Johnson's wrongful action to dilute Beck's shareholding in Pineapple. He also requested an award of actual and punitive damages in a total sum of $1,250,-000.00, based on all of these causes of action.

Johnson then commenced a responsive lawsuit against Beck's consulting company, based upon the same events and certain others. In their counterclaim in Beck's lawsuit and in their own lawsuit against Beck, Plaintiffs requested an award of damages against Beck under theories of misappropriation, conversion, or embezzlement; breach of fiduciary duty; fraud; abuse by Beck of Johnson's grant of a power of attorney; and recovery of excessive salary on a *quantum meruit* basis, among others. These lawsuits were consolidated by the Hennepin County District Court and were progressing through discovery when Johnson obtained this Court's protection.

## POST–BANKRUPTCY PROCEDURAL HISTORY

Beck and his personal consulting company moved for a grant of relief from stay in Johnson's case, requesting leave to proceed to judgment in the Hennepin County District Court actions. On September 15, 1989, this Court denied that motion, on condition that Johnson commence an adversary proceeding to determine whether 11 U.S.C. § 502(b)(7) limited the allowability of Beck's claims in Johnson's case.[2]

This adversary proceeding, and Pineapple's later joinder as a party-plaintiff to it, are the results of that order. The parties have made two identical requests for declaratory relief: first, as to whether 11 U.S.C. § 502(b)(7) limits the amount of Beck's claim which may be allowed for the purposes of Johnson's and Pineapple's bankruptcy cases; and second, as to whether Beck's claims, limited in allowability or not, are subject to offsets based on the counterclaims raised by Plaintiffs in the Hennepin County lawsuits. The parties have now made cross-motions for summary judgment on the first request.

---

**2.** The September 27, 1989 memorandum to that order has been reported as *In re Johnson,* 115 B.R. 634 (Bankr.D.Minn.1989).

## DISCUSSION

This adversary proceeding is not an objection to the allowance of Beck's claim in either plaintiff's bankruptcy case. As everyone contemplates, this adversary proceeding is a preliminary to such an objection; the isolated issue at bar is whether certain substantive bankruptcy law would limit the allowed amount of Beck's claim in both cases. The parties have agreed to reserve the submission of the issues relating to the fixing and liquidation of Beck's claims until Plaintiffs make formal objection pursuant to 11 U.S.C. § 502(a) and BANKR.R. 3007.

Given the lack of triable fact issues, the parties' first request for declaratory relief is ripe for summary judgment. FED.R. CIV.P. 56(c), *as incorporated by* BANKR.R. 7056.

11 U.S.C. § 502 governs the allowance of claims in bankruptcy cases. 11 U.S.C. § 502(a) provides that "[a] claim ..., proof of which is filed under section 501 of [Title 11], is deemed allowed, unless a party in interest ... objects." 11 U.S.C. § 502(b) then governs the allowability of various sorts of claims to which objection may be made. Under § 502(b), the Court must first require a hearing on notice on an objection to a claim, with prior notice to the claimant. The Court must then "determine the amount of such claim in lawful currency of the United States as of the date of filing of the [bankruptcy] petition," and then allow the claim in that amount.

This mandate of allowance, however, is subject to certain exceptions. 11 U.S.C. § 502(b)(7), one of those exceptions, is the focus of this adversary proceeding; it provides that a claim shall *not* be allowed:

... if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds—

(A) the compensation provided by such contract, without acceleration, for one year following the earlier of—

(i) the date of the filing of the petition; or

(ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus

(B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates ...

This provision operates to put a "cap" on the amount of the employment-related claim of a terminated employee of the debtor, regardless of the amount of the claimant's asserted or actual right to damages under state law. *In re Aero–Auto Co., Inc.*, 33 B.R. 107, 108 (Bankr.E.D.Va. 1983).[3] Essentially, it limits the allowed amount of the sort of employee claims for damages which are calculated on the basis of the future compensation which the claimant would have earned, had the employer not terminated the contract. *In re Prospect Hill Resources, Inc.*, 837 F.2d 453, 455 (11th Cir.1988).

As framed by the state-court pleadings, Beck's claims for damages[4] against Johnson sound under several legal theories which are to some extent divergent from the theories underlying his claims against Pineapple. Also, the various claims are based upon facts and events which are not always common to all of the claims. In their main argument, Plaintiffs have tended to blur these distinctions, and have not fully acknowledged that some of Beck's

---

**3.** The limitation of the amount of the allowed claim, of course, can have significant consequences for the claimant's right to distribution from the estate, as well as the proportionate power which the claimant may wield in the reorganization process through exercise of the franchise in acceptance or rejection of the plan, among other things.

**4.** For the remainder of this order, "claim," in the singular, shall signify an individual right of recovery under a specific state-law theory, as asserted by Beck against one or the other plaintiff, rather than Beck's collective right to share in each plaintiff's bankruptcy estate in the sense of the defined term of 11 U.S.C. § 101(4). In their aggregate, all of Beck's "claims," in the state-law sense, as against each plaintiff, constitute *a* "claim" in the bankruptcy sense. For reasons of style and precision, use of the state-law paradigm is preferable—given the multifold nature of Beck's "claim" in the bankruptcy-law sense.

claims are unrelated to the Employment Agreement and its alleged breach. Compounding this, Plaintiffs essentially assert that the September 1, 1986 agreement was a single, indivisible "employment contract," however many separate covenants it contained. They then assert that all of the covenants of the agreement fall within the scope of § 502(b)(7), and that all of Beck's claims for damages stem from the parties' roles and statuses under that single contract.

Among other things, this analytic framework ignores the fact that Beck's claims in the state-court lawsuits include several which sound in tort and under corporate-law theories. These latter claims are distinct in substance from those which sound in breach of contract and which are based on Plaintiffs' alleged failure to carry out their obligation to employ Beck. Beck's responsive argument is based on the correct construction of the contract and the state-court litigation: his several causes of action, some against Johnson, some against Pineapple, and a few against both, are legally distinguishable. Given the nature of the adjudication which the parties seek, Beck's various claims must be analyzed individually, and in the separate context of each plaintiff's bankruptcy case.

### A. Allowability of Beck's Claim in Pineapple's Case.

Two, and possibly three, separate claims are joined in Beck's state-court lawsuit against Pineapple. Specifically, they are a claim based on Pineapple's termination of his employment, which sounds under breach of contract; a claim based on Pineapple's failure to repurchase his stock, which again sounds under breach of contract; and, possibly, a claim based on Pineapple's alleged dilution of his shareholder's interest by the issuance of additional shares to Johnson, which sounds under corporate-law theories.

### 1. Claim Stemming from Termination of Employment.

Whatever else it might encompass, the "Employment Agreement" unquestion-

ably contains an employment contract within the contemplation of § 502(b)(7), for the purposes of Pineapple's case. It certainly "provide[s] for the employment relationship itself"—i.e., it creates an employer-employee relationship by its terms. *See United Steelworkers of America v. Cortland Container Corp.*, 105 B.R. 375, 379 (N.D. Ohio 1989). It bears the essential attributes of a contract to create an employer-employee relationship, some of which were delineated in *In re The Charter Co.*, 82 B.R. 144 (Bankr.M.D.Fla.1988), and *In re Aero–Auto Co., Inc.:* its title identifies it as creating an employment relationship; it contemplated Pineapple's hiring and retention of Beck for specific purposes; while not binding Beck exclusively to Pineapple's employ, it did vest both parties with certain rights and expectancies for the continuation of the relationship; it included indemnification, non-competition, and confidentiality provisions typical of contracts for the employment of high-level managerial and professional personnel; and Beck's involvement with Pineapple was terminated upon a notice given pursuant to the terms of the agreement. *See* 82 B.R. at 146, and 33 B.R. at 108–09.

Beck does not insist that the agreement is outside the scope of § 502(b)(7) as to Pineapple, and thus apparently concedes this threshold point. He argues, however, that the cap of § 502(b)(7) does not apply because the alleged breach giving rise to his claim was "too remote in time" from Pineapple's bankruptcy filing. As a second variation to this temporally-based approach, Beck argues that § 502(b)(7) does not apply because the termination giving rise to his claim did not "arise out of" Pineapple's petition for bankruptcy relief, and did not stem from any consequence of the filing.

As his main authority for both of these propositions, Beck cites *In re Vic Snyder, Inc.*, 23 B.R. 185 (Bankr.E.D.Pa.1982). *Vic Snyder* involved a former employee's claim which arose from a termination which had taken place four and one-half years before the employer's Chapter 11 petition. The *Vic Snyder* court declined to apply the cap

of § 502(b)(7) [5] to the claim, specifically because the operative event occurred so long in the past. Acknowledging that the legislative history to § 502(b)(7) did not provide much guidance, the *Vic Snyder* court nonetheless concluded that it could "reasonably infer that Congress intended the provision to apply to breaches of contract occurring as a result of the bankruptcy or from an agreement rejected in the reorganization proceeding." 23 B.R. at 187. It went on to suggest, somewhat vaguely, that a termination made "as part of a deepening financial problem"—apparently either pre- or post-petition—was the scenario to which the § 502(b)(7) cap was to apply. *Id.* The underlying rationale of *Vic Snyder* seems to be that a debtor is barred from asserting the cap of § 502(b)(7) for employment-termination claims which had arisen prior to some cutoff date, itself before the date of the employer's bankruptcy filing. That cutoff date presumably is to be fixed by the Bankruptcy Court, in the exercise of some sort of equitable discretion.

The *Vic Snyder* decision is an isolated holding, not explicitly followed in any other reported decision. It has several flaws. First, to the extent it would even countenance the application of the cap to a claim based on a pre-petition termination, it does not enunciate a standard for the cutoff of that application. Beyond this, the major difficulty with *Vic Snyder* is that, on its face, § 502(b)(7) contains no such qualification; there is no language expressly limiting the cap to claims based on post-petition terminations, or to both post-petition terminations and to pre-petition terminations which occurred within a specific time before the bankruptcy filing, after the occurrence of specified events, or after some other objectively-determinable deadline. Further, the legislative history to § 502(b)(7) contains no support for such a conclusion.

■ The intent of Congress must be divined first from the face of the legislation

which it passes. *In re Groth,* 69 B.R. 90, 92 (Bankr.D.Minn.1987). Congress has manifested no intent to limit the application of the § 502(b)(7) cap to claims arising after a specific point in a debtor-employer's business history. Were the Court to adopt Beck's preferred rationale to impose such a qualification, it would engage in an act of judicial legislation. *Compare In re Continental Airlines Corp.,* 64 B.R. 865, 873 (Bankr.S.D.Tex.1986) (noting that neither language of nor legislative history to § 502(b)(7) supported the limitation of its applicability to certain types of employment contracts).

Under the same reasoning, the language of the statute resoundingly defeats Beck's alternative argument. To be sure, a number of reported decisions making passing reference to § 502(b)(7) as being triggered by the *post*-petition *rejection* of an employment contract by a debtor-employer. *See, e.g., In re Prospect Hill Resources, Inc.,* 837 F.2d at 455; *In re Gee & Missler Services, Inc.,* 62 B.R. 841, 845 (Bankr.E.D. Mich.1986); *In re Continental Airlines Corp.,* 64 B.R. at 873. However, none of these cases involved a claim based upon a *pre*-petition *termination* of an employment contract; thus, the wording of the rulings might well be attributed to stylistic imprecision.

Beyond this, the problem with this alternative limitation is, again, that the statute does not provide for it. Section 502(b)(7) is not limited to claims arising from post-petition rejection pursuant to 11 U.S.C. § 365(a); the statute uses the word "termination," a word with a significance much broader than the bankruptcy-law term of art "rejection." Further, the statute makes no reference to § 365(a). In using the more-inclusive word "termination," Congress manifested its intent to extend the cap of § 502(b)(7) to claims arising from pre-petition terminations.

The scanty legislative history for § 502(b)(7) further supports the conclusion:

---

5. Or, more correctly, 11 U.S.C. § 502(b)(8)—the enumeration of this provision which was on the books before the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98– 353, 98 Stat. 333 (1984). The 1984 Act deleted another subparagraph of § 502(b), resulting in a renumbering of the remaining ones.

[§ 501(b)(7) ] tracks the landlord limitation on damages provision in [§ 502(b)(6) ] for damages resulting from the *breach* by the debtor of an employment contract ...

H.R.REP. No. 595, 95th Cong., 1st Sess. 354 (1977); S.REP. No. 989, 95th Cong.2d Sess. 64–65 (1978) (emphasis added). This reference to breach of contract, a common-law concept which has no inherent relationship to bankruptcy, is very important. Clearly, had Congress intended to limit § 502(b)(7) to post-petition claims arising from a debtor's or a trustee's use of § 365(a) remedies, it would have referred to that very specific triggering event on the face of the statute, or in its own pre-enactment committee reports.

Thus, Beck cannot avoid the application of § 502(b)(7) to at least one of his claims against Pineapple. His claim against Pineapple for lost wages and the other damages which he attributes to the alleged wrongful termination of his employment is subject to the statutory cap.

2. Claims Stemming from Alleged Breach of Stock Repurchase Agreement, and from Alleged Dilution of Shareholding.

■ This does not mean that Beck's other claims against Pineapple are subject to the cap, however. In a separate count of his complaint, Beck alleges that Pineapple breached that part of the "Employment Agreement" under which Pineapple was obligated to repurchase his shares of stock if his employment were terminated by Pineapple. Admittedly, the covenant upon which Beck based this claim for breach of contract was part of a document which, in other parts, did create an employment relationship. However, the covenant to repurchase governed Pineapple's and Beck's rights and obligations in a completely different relationship.

Beck became a shareholder in Pineapple before he became its employee, or at least at the same time that he did. The shares which he received were not issued in consideration for his services; he paid for them in cash, and in an amount which was not inconsiderable. Unquestionably, Beck's personal investment in Pineapple was an important incentive for his performance as employee; one strongly suspects that Plaintiffs fully intended this. The fact remains, however, that Beck tendered consideration for his stock in a form other than that of his future services. This makes his relationship to Pineapple as a shareholder factually and legally distinct from his relationship as employee. The fact that the parties merged several agreements into one writing has no significance in itself.

Pineapple's argument that all of Beck's stock-related claims against it are subject to the § 507(b)(7) cap because Beck became a shareholder in contemplation of his central involvement as an employee is entirely too facile; it elides the fact that the "Employment Agreement" was an integrated agreement which embodied separate contracts governing two or more distinct relationships. These claims do not stem from a relationship which is one of employer and employer; they are not subject to the § 502(b)(7) cap.

*B.  Allowability of Beck's Claim in Johnson's Case.*

Three separate claims are joined in Beck's state-court lawsuit against Johnson: a claim based on Johnson's alleged causal involvement in Pineapple's termination of Beck's employment, under the theory of tortious interference with contractual relationships and, therefore, sounding in tort; a claim based on Johnson's alleged breach of his personal guarantee of Pineapple's performance of its obligations under the Employment Agreement, which sounds under breach of contract; and a claim based on Johnson's alleged manipulation of his control of Pineapple to the detriment of Beck's minority shareholder's interest, premised again upon the alleged stock dilution and additionally on certain other acts of Pineapple's management. Beck legally characterizes this last claim as one for breach of a majority shareholder's fiduciary duty to a minority shareholder, which

means that it sounds under corporate-law theories.

### 1. Claim Stemming from Alleged Breach of Fiduciary Duty.

■ The issue of the applicability of § 502(b)(7) to Beck's breach-of-fiduciary duty claims against Johnson does not require extended discussion. These claims arise out of a relationship which is *not* one of employer and employee, but of co-investors in a small business corporation, one with a controlling interest and one with a non-controlling interest. Section 502(b)(7) simply does not speak to claims arising out of a debtor's alleged abuse of a majority-shareholder status in such a relationship; on its face, it applies only to an employment relationship.

As the Eleventh Circuit noted in *In re Prospect Hill Resources, Inc.,*

> One purpose of section 502(b)(7) was to relieve bankrupt employers of the continuing duty to pay high salaries to officers and owner-managers who had been able to extract favorable terms of tenure and salaries while the business prospered.

837 F.2d at 455. The necessary corollary is that any obligation between a debtor-employer and a claimant-employee which arises out of another sort of legal relationship between them is not subject to § 502(b)(7). This conclusion is particularly appropriate where, in the alternate legal relationship, the claimant did not wield the degree of control or influence that he did in the status of a key-person officer-employee or manager-employee.

To be sure, the measure of damages for part of this claim—that based on Johnson's alleged manipulation of his majority control to terminate Beck's employment—may be the amount of future salary which Beck allegedly lost. *See Evans v. Blesi*, 345 N.W.2d 775 (Minn.App.1984). This does not change the fact that the claim is not itself legally based on a breach of an employment agreement. In addition, the measure of damages for the remainder of this claim would seem to be the alleged diminution in the value of Beck's stockholding.

This, of course, has nothing to do with the amount of his salary, actual or potential, or any other incident of the employment relationship. Its factual genesis in a shareholder-shareholder relationship, and the substantive law governing that relationship, isolate this claim from Beck's employment relationship with Pineapple. As noted earlier in Section A.1., that legal relationship, and the termination of it as the source of a claim, are the fundamental requirements for the invocation of § 502(b)(7).

### 2. Claim Stemming From Alleged Tortious Interference with Beck's Employment Relations.

■ Beck's second claim against Johnson stems from Johnson's involvement as an individual in Pineapple's termination of Beck's employment. The applicability of § 502(b)(7) is a closer case here. Beck seeks redress for the harm he allegedly suffered from the loss of his employment, from a person whom he alleges was directly and personally responsible for the termination; thus, this claim has its genesis in the same operative event which undeniably triggers the § 507(b) cap for Beck's breach-of-contract claim against Pineapple. On the other hand, it is asserted against someone who was not himself a party to the employment contract.

Johnson urges an expansive reading of § 507(b)(7), so as to make its cap applicable to any claim against a debtor in bankruptcy which arises out of that debtor's causal role in the event of the termination of an employment contract, whether the debtor was a party to that contract or not. The language of the statute does not rule out this construction; it does not read so as to refer to "the claim of an employee *of the debtor* for damages resulting from the termination of an employment contract *with the debtor* ..."

However, the whole tenor of § 502(b)(7) is such as to limit it to claims against debtors which were the employers in contractual privity with the employee-claimant under the contract in question. Section 502(b)(7) is in derogation of the general

bankruptcy-law principle that creditors are to share ratably in a debtor's estate, according to the priorities established under the Bankruptcy Code. Absent some indication on the face of the statute or some specific statement in legislative history, it should not be given an expansive reading. This is particularly indicated where the wrong which the debtor is alleged to have committed was not a breach of its own contract, but rather the tort of interference with the claimant's contractual relations with a third party, and where the debtor was not a direct party to the employment relationship. The statute simply should not be read to cap Beck's second claim.

### 3. Claim Stemming from Johnson's Alleged Breach of Personal Guaranty.

In the alternative, Johnson argues that § 502(b)(7) applies to Beck's claim which is based on the alleged breach of his personal guaranty of Pineapple's performance of its obligations under the Employment Agreement. Essentially, the argument is the same as for the second claim against Johnson: this claim relates to rights under the Employment Agreement, and should fall within the sweep of § 502(b)(7)—regardless of the legal theory under which it may sound. This argument does not prevail, for two reasons. First, as with Beck's second claim against Johnson, § 502(b)(7) cannot apply because the terminated employment relationship did not run between Johnson and Beck, and Johnson hence was not directly entitled to the protection of the statute.

There is a second and independent basis for this conclusion which results from the nature of Johnson's alleged liability to Beck under the third claim. Johnson personally guaranteed Pineapple's performance of its obligations under the contract. If Pineapple wrongfully breached the Employment Agreement in terminating Beck, Johnson is obligated under state law to make Beck whole:

> Generally, the purpose of a guaranty is to provide payment when for any reason the principal debtor fails to discharge his obligations.

*Victoria Highway Village, Inc. v. Weaver,* 634 F.2d 1099, 1102 (8th Cir.1980) (applying Minnesota law).

Johnson essentially argues that, to the extent that the § 502(b)(7) cap is applicable to Beck's claim against Pineapple, his derivative obligation as guarantor is similarly limited. This argument fails, both as a matter of Minnesota state law and as a matter of federal bankruptcy law.

■ Where the principal debtor to a guaranteed obligation is in default but the creditor's acts have brought about a release or discharge of the principal debtor, the guarantor is also discharged from liability unless the creditor's right of recourse against the guarantor was expressly reserved in the instrument of guaranty or in any instrument under which the creditor released the principal debtor. *Victoria Highway Village, Inc. v. Weaver,* 480 F.Supp. 71, 75 (D.Minn.1979). This surviving right of recourse is generally reflected in the form of language in the governing instrument which provides that the guaranty is unconditional. In the absence of language which clearly indicates that a guaranty is conditional, it is usually treated as absolute. *Dahms v. Industrial Credit Co.,* 261 Minn. 26, 33, 110 N.W.2d 484, 489 (1961).

■ Johnson's liability to Beck under his guaranty of Pineapple's obligations is governed by Minnesota law. The simple and unmistakable language of the guaranty instrument makes Johnson's guaranty an absolute and unconditional one. Had Pineapple filed for bankruptcy or otherwise obtained a full or partial release, but had Johnson not done so, the claim would have been enforceable in its full amount against Johnson, notwithstanding any limitation on its allowability and possible discharge in Pineapple's case.

Beyond this, § 502(b)(7) does not operate in Johnson's case to cap his guarantor's liability to Beck. *In re Modern Textile, Inc.,* 28 B.R. 181, 188 (Bankr.E.D.Mo.1983). To be sure, and as Plaintiffs note, the Court in *In re Rodman,* 60 B.R. 334 (Bankr.W.D.Okla.1986), came to the contrary conclusion in applying the analogous

cap provision of 11 U.S.C. § 502(b)(6).[6] *Rodman's* discussion of the basis for its holding is cursory; the *Rodman* court relies solely on a rather broad-brushed application of the immemorial preference for ratable distribution in bankruptcy cases, rather than on any specific authority in statute or caselaw. Like *Vic Synder,* however, the history since its publication has made *Rodman* an isolated decision. Other courts addressing the same issue have pointed to the lack of statutory or legislative-history support for *Rodman's* proposition. *In re Danrik, Ltd.,* 92 B.R. 964 (Bankr.N.D.Ga.1988) (applying § 502(b)(6)). They have noted that both the operation of 11 U.S.C. § 524(e)[7] and a common-sense recognition of the commercial function of personal guaranties dictate the opposite conclusion. *Bel–Ken Assoc. Ltd. Partnership v. Clark,* 83 B.R. 357 (D.Md.1988). These decisions are well-supported in theory, law and policy; they avoid the reliance on vague principles of "equity in bankruptcy" which flaw the basis of the *Rodman* decision. This Court adopts their rationale, and rejects that of *Rodman.* The necessary consequence is that the limitation on the allowability of Beck's claim in Pineapple's case does not reduce the amount of the underlying debt itself which may be asserted as a guaranty-derivative claim in Johnson's case.

## ORDER FOR JUDGMENT

On the basis of the foregoing findings and discussion, then,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. That the allowance of the claim of Defendant against Plaintiff Pineapple Management Company, which claim is one for damages resulting from that Plaintiff's alleged breach or termination of the September 1, 1986 Employment Agreement between that Plaintiff and Defendant, is sub-

ject to the limitation prescribed by 11 U.S.C. § 502(b)(7).

2. That the allowance of all other claims of Defendant against Plaintiff Pineapple Management Company is not subject to the limitation prescribed by 11 U.S.C. § 502(b)(7).

3. That the allowance of the claims of Defendant against Plaintiff Harry A. Johnson, Jr. is not subject to the limitation prescribed by 11 U.S.C. § 502(b)(7).

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

6. As the legislative history notes, § 502(b)(7) was intended to "track ... the landlord limitation on damages provision" of § 502(b)(6). H.R.REP. No. 595, 95th Cong. 1st Sess. 354 (1977); S.REP. No. 989, 95th Cong.2d Sess. 64–5 (1978).

7. Section 524(e) provides that, with the exception of certain claims under community-property law, "discharge of a debt of the debtor [in bankruptcy] does not affect the liability of any other entity on ... such debt."