In re **ALLEGHENY INTERNATIONAL, INC., Sunbeam Corporation, Sunbeam Holdings, Inc., Almet/Lawnlite, Inc., and Chemetron Corporation, Debtors.**

**Bankruptcy No. 88–448.**

United States Bankruptcy Court, W.D. Pennsylvania.

July 17, 1992.

See also, 158 B.R. 343, 158 B.R. 356, 158 B.R. 361.

George Cass, Pittsburgh, PA, for debtors.

Michael G. Lederman, Providence, RI, Cynthia A. Baker, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Sunbeam/Oster.

James A. Lewis, Bruce M. Campbell, Pittsburgh, PA, for Robert J. Buckley.

### MEMORANDUM OPINION

JOSEPH L. COSETTI, Chief Judge.

At issue are motions for partial summary judgment filed against Allegheny International, Inc. (hereinafter "AI"), by Robert J. Buckley (hereinafter "Buckley"). Buckley asks this court to determine, as a matter of law, that he resigned from his positions and employment at AI and that 11 U.S.C. § 502(b)(7) does not limit his contract claims. For the reasons stated below, both motions are denied.

Also at issue are partial summary judgment motions filed by AI against Buckley. AI asks that this court determine that 11 U.S.C. §§ 502(b)(4) and (b)(7) limit Buckley's breach of employment contract claims, and that Buckley owes AI principal and interest on four loans that AI made to Buckley. As discussed below, both motions are granted.

## I. FACTS

Claimant Buckley was hired in 1972 by Allegheny Ludlum Industries, Inc. (hereinafter "AL"), the predecessor of AI. In 1976, Buckley became chairman of the AL Board of Directors and chief executive officer. Buckley continued as AL or AI's chairman until August 1986.

On August 8, 1986, Buckley submitted a letter of resignation to AI. On the same day, AI's Board of Directors (hereinafter

the "Board") accepted his resignation.[1] On September 22, 1986, AI notified Buckley in writing that the Board would consider a resolution terminating his employment for cause at its October 28, 1986 meeting. At its March 13, 1987 meeting, which was continued from the October 28, 1986 meeting, the Board adopted a resolution terminating Buckley for cause. Buckley was notified of this result by a letter dated March 20, 1987.

During his employment at AI, Buckley borrowed at total of $2,921,840 in the form of four promissory notes through AI's Loan Stock Purchase Program. These loans have not been repaid.

On February 20, 1988 AI filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code. On May 11, 1988, Buckley filed a timely proof of claim, asserting that he was owed greater than $6,000,000 due him under various contracts related to his employment at AI.

On or about November 23, 1988, AI filed its objections to Buckley's proof of claim. AI challenged the claim on the grounds that Buckley was not entitled to the amounts because his employment was terminated for cause. In addition, AI filed a counterclaim against Buckley seeking recovery of over $2.9 million owed by Buckley to AI under the four promissory notes.

On or about January 13, 1989, the Official Committee of Equity Holders of AI filed objections to Buckley's claim. On or about September 20, 1989, the Official Committee of Unsecured Creditors of AI filed objections to Buckley's claim. Both Committees argued that Buckley's claim should be capped by the requirements of 11 U.S.C. §§ 502(b)(4) and (b)(7).

Buckley has filed a motion for partial summary judgment,[2] on the issue of liability only, regarding whether he is entitled to receive payments due him under his Excess Benefit and Special Early Retirement Pension Plans, his Employment Agreement, the Key Man Salary Continuance Program, and his Stock Option Agreements.[3] In addition, Buckley asks for partial summary judgment on the issue of whether 11 U.S.C. § 502(b)(7) would limit his recovery under the employment contract. He argues that his claims should not be capped by 11 U.S.C. § 502(b)(7). AI has asked for a partial summary judgment on the issue of the unpaid promissory notes, and on the issue of whether 11 U.S.C. §§ 502(b)(4) and (b)(7) limits Buckley's claims.

## II. Buckley's Summary Judgment Motions

### A. Employment Contract Benefits

#### 1. Resignation Issue

■ Buckley asks this court to enter partial summary judgment in his favor on the issue of whether he is due benefits arising

---

1. Whether this letter, and the Board's acceptance of it, was effective in terminating Buckley's employment at AI is the subject of dispute, and will be discussed *infra* in this Memorandum Opinion.

2. Summary judgement is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgement as a matter of law." Fed.R.Civ.P. 56(c) *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (the question to be decided is whether there is sufficient evidence upon which a reasonable jury could find for the non-moving party by a preponderance of the evidence.); *Jones v. Philpott,* 702 F.Supp. 1210, 1212 (W.D.Pa.1988).

3. The following is a description of some of Buckley's benefits:
*Pension Benefits—Excess Benefit Plan*—provided the difference between the ERISA maximum and the amount of retirement benefits Buckley would have got from AI.
*Pension Benefits—Special Early Retirement Program*—provided special benefits to Buckley if he had retired between July 15, 1986 and August 15, 1986.
*Employment Agreement Benefits—Supplemental Benefits*—In addition to Buckley's regular pension benefits, this required AI to pay an additional amount equal to the difference between Buckley's benefit payment under the Pension Plan for Salaried Employees and the amount that benefit payment would have been if Buckley's length of service had been twice his actual service.
*Key Man Salary Continuance Program*—provided for 9+ years of 50% salary after retirement.

under his employment contract with AI. Buckley argues that because he resigned, and was not terminated for cause, he is entitled to these benefits.

Under Buckley's Employment Agreement (hereinafter "Agreement") with AI, the Board can terminate Buckley for just cause.[4] If Buckley had been terminated for just cause, the Agreement provides that he would lose the benefits provided in his employment contract.[5] Buckley's Stock Options Plans and the Key Man Salary Continuance Program also provide that if he were terminated for cause these benefits would terminate. Buckley asserts that his *resignation* from AI precluded the Board from discharging him for just cause. He argues that because he resigned from employment at AI on August 8, 1986 and the Board accepted his resignation, his Agreement with AI ended, and thus the Board's attempt to terminate him for just cause in March, 1987 was null and void because there was no contract to terminate.[6]

Buckley claims his resignation letter and the Board's acceptance of it created a binding contract terminating his employment with AI. Buckley also asserts that because he received no salary from AI after August 8, 1986, was not asked to do any work for AI after August 8, 1986, and in fact did no work for AI after August 8, 1986, that the intent of the parties was to end Buckley's employment with AI on August 8, 1986.

Buckley cites cases to support the proposition that only objective indicia of the intent of the parties are relevant in determining the scope of an agreement. *See, e.g., Brokers Title Co., Inc. v. St. Paul Fire & Marine Ins. Co.*, 610 F.2d 1174, 1181 (C.A.3 Pa.1979) (the subjective meaning attached by either party to a form of words is not controlling on the scope of a particular agreement unless one party knows or has reason to know of a particular meaning attached by the party manifesting assent); *Amoco Oil Company v. Snyder*, 505 Pa. 214, 478 A.2d 795, 798 (1984) (where the language is clear and unambiguous, the focus of interpretation is on the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended); *See also*, J. Murray, Jr., *Murray on Contracts* § 48, at 55 (3d ed.1990) (the outward manifestations of the parties—their expressions—will be viewed as the exclusive evidence of their intentions).

In the instant case, however, the objective meaning of the contract and outward manifestations of the parties are not clear. Viewing the evidence in a light most favorable to the nonmoving party, AI, there are genuine issues of material fact concerning whether Buckley did resign from all aspects of employment at AI on August 8, 1986. These issues preclude the granting of this partial summary judgment motion:

(1) In his letter, Buckley indicated that he was resigning from his offices and Board positions. Similarly, the Board in its resolution accepted Buckley's resignation

---

**4.** Paragraph IV of Buckley's May 1, 1980 employment contract with AI states:

Notwithstanding any of the foregoing provisions of this Agreement, the Executive may, at any time during the term of this Agreement, be discharged by the Board of Directors of the Company for just cause, and in such event this Agreement and all of the rights and obligations of the parties hereto shall forthwith terminate. Such action by the Board of Directors shall be taken only upon the vote of not less than a majority of the directors then in office, after reasonable notice to the Executive and an opportunity for him to be heard before the Board.

**5.** Benefits under Buckley's employment contract (the "Agreement") included supplemental pension benefits. *See supra* note 3.

**6.** Buckley's August 8, 1986 letter read:

"I resign as Chairman, President, Chief Executive and Chief Operating Officer and as a Director of Allegheny International, Inc., effective upon the acceptance of this resignation by the Board of Directors of Allegheny International, Inc."

In response, the Board at its August 8, 1986 meeting passed a resolution that stated:

"RESOLVED, That the Corporation and its Board of Directors hereby accept the resignation tendered today by Robert J. Buckley from the offices he holds with and as a member of the Board of Directors of the Corporation."

from the offices and Board positions held by Buckley.[7] But neither party, in the resignation letter or its acceptance by the Board, manifestly expressed an intent to completely terminate Buckley's Agreement. There is a question of material fact concerning whether Buckley and AI intended to reject the Agreement and terminate the entire employment relationship, or whether it was the intention of the parties to resign the various offices but continue an employment relationship.

Buckley's Agreement expressly states that in addition to performing the duties of his offices and the Board, he was obligated to perform "such executive and managerial services and such other responsibilities which may be assigned to him by or under the authority of the Board of Directors." Appendix to Sunbeam–Oster Company, Inc.'s Motion for Partial Summary Judgment, Exhibit E, p. 2. If it was not the intent of the parties to totally discontinue Buckley's employment with AI, his contract obligated his continued performance.

(2) At its October 28, 1986 meeting, the Board met to discuss terminating Buckley for just cause. Buckley appeared at the meeting with counsel to contest the Board's allegations. At no time did Buckley argue that the proceeding was moot because he had resigned on August 8, 1986. Rather, he argued that there was not just cause for his termination.

(3) On February 10, 1987, Buckley testified before the Securities and Exchange Commission. During his testimony he was asked if he was still employed at AI. Buckley answered that he believed so. When asked in what capacity he was employed at AI, he answered that he was an employee of AI.

(4) After being terminated by the Board for cause, Buckley sent AI a letter on May 27, 1987, which indicated that he considered his Agreement with AI to be in effect and that he was available to serve AI consistent with the Agreement.

(5) On July 10, 1987, Buckley sent another letter to AI. In this letter he attempted to terminate his Agreement by taking early retirement and demanded salary and benefits due under the contract from August, 1986 to May, 1987.[8]

The above evidence raises questions concerning whether Buckley and AI intended to terminate the entire employment relationship on August 8, 1986. The outward manifestations of Buckley and AI give rise to genuine issues of material fact that preclude summary judgment.

■ A board of directors needs a reasonable amount of time to investigate charges against an employee. While it is unclear whether Buckley was a wrongdoer, it would be premature to decide this issue on a motion for summary judgment. Perhaps more important it would seem unfair to permit a formal resignation procedure to preclude termination for just cause, and to conclude that the employee is automatically entitled to the benefits of his contract as a form of vesting. Such a policy would provide a wrongdoer the right to escape liability by resigning just prior to termination. It takes time to investigate these matters and a major corporation requires actual officers in place on a day to day basis.

In addition, even if Buckley were found to have resigned from all aspects of his employment at AI on August 8, 1986, it is not clear that the Board was automatically precluded from being able to terminate Buckley for cause. Article VI of Buckley's May 1, 1980 Agreement states that, with two exceptions, his employment contract expired three years and one month after notice of termination is given.[9] Thus, one

---

**7.** For the text of Buckley's resignation letter and the Board's resolution, see *supra* note 6.

**8.** This is not intended to be an exclusive list of Buckley's and AI's actions regarding Buckley's employment at AI.

**9.** Article VI of the May 1, 1980 employment agreement provides in pertinent part:

"[T]he term of this Agreement shall automatically be extended beyond December 31, 1984 and shall expire (a) three years after notice of termination is given by either party to the other (b) Executive reaches age 65 or (c) takes early retirement prior to reaching age 65, whichever first occurs."

interpretation of the instant case could be that unless Buckley was taking early retirement by resigning on August 8, 1986,[10] his contract with AI would not expire until Fall 1990. During this time, the Board could have terminated Buckley for cause and eliminated Buckley's benefits.

Similarly, the contract for Buckley's Key Man Salary Continuance Program (hereinafter "Program") stated that if Buckley were to voluntarily quit before his retirement date, all benefits under the Program terminated.[11] Further, even if Buckley were found to have retired from AI, he was required to give a number of months notice.[12] If Buckley were found to have retired on August 8, 1986, interpreting the notice requirement most favorable to Buckley would mean that he would not receive benefits under the Program for four months: until December, 1986.[13]

Further, even if Buckley were deemed to have retired on August 8, 1986, he may not have received benefits under the Stock Option Plan or the Special Early Retirement Program. The Stock Option Plans that

Buckley had with AI specified that after employment ceased with AI, Buckley had three months to exercise his Option rights or they would terminate. Buckley did not exercise these rights within three months of August 8, 1986.[14] Likewise, the Special Early Retirement Program provided a one month window from July 15, 1986 to August 15, 1986 for Buckley to elect to participate in the program. The available evidence indicates that he did not elect to do so.

There are sufficient allegations of fact, however, to find that Buckley was due a portion of his salary under his Agreement. If Buckley didn't effectively resign or retire on August 8, 1986, he was still an employee of AI and was due his salary until he was terminated for cause in March, 1987.[15]

### 2. *Excess Benefit Pension Plan*

■ Buckley also asks this court to enter partial summary judgment on the issue of liability only, holding that Buckley is entitled to payments due under the Excess

The contract was amended by an agreement dated February 3, 1986. Part 1B provides, in pertinent part:

"In order for him to terminate the term of his Employment Agreement, the Employee agrees to give the Corporation one additional month's advance notice of his election to terminate beyond the period of notice of termination now required of him under the Employment Agreement to terminate that agreement."

10. On August 8, 1986 Buckley was 62 years old.

11. Part 4 of the June 1, 1982 Key Man Salary Continuance Program Agreement states in pertinent part:

"If the regular employment of the Employee is terminated by discharge by the Company, voluntarily quitting his employment prior to his retirement date, or for any reason other than death, total disability or retirement on his retirement date on or after his sixty-second birthday, all liability of the Company under this Agreement shall thereby be terminated."

This Agreement was amended on March 5, 1986 to allow Buckley early retirement before age 62 with benefits then commencing when Buckley turned 62.

12. Part of the 1986 Agreement requires one month's notice of termination on top of what was required in Buckley's Employment Agreement. It also states that if no advance notice of termination was required in the Employment Agreement, Buckley has to provide three months advance notice of his termination from employment.

13. This four month notice requirement is based on the three month requirement under the Key Man Salary Continuance Program Agreement plus the one month requirement of the 1986 Employment Agreement.

14. Buckley did try to exercise his Stock Option Rights, but not until the three-month period after he was terminated for cause in March, 1987. This action lends further support to AI's argument that Buckley did not intend to resign in August, 1986, but rather did not believe his employment with AI ended until he was terminated for just cause.

15. As discussed *infra* in this Memorandum Opinion, Buckley's claims, if any, would be subject to the caps of 11 U.S.C. §§ 502(b)(4) or (b)(7). A claim for unpaid salary from August, 1986 through March, 1987 would not be subject to these caps.

Benefit Plan (hereinafter "Plan").[16] He argues that the Plan does not provide for termination of benefits as a result of a discharge for just cause.

The language of the Plan, however, clearly allows the Board to discontinue it at any time.[17] Pursuant to this, at its March 13, 1987 meeting, the Board passed a resolution stating that persons terminated for cause are ineligible to receive benefits under the Plan. At the same meeting, the Board also discharged Buckley for cause, making him ineligible to receive Plan benefits.

Buckley argues that the Board was unjustified in terminating him for cause. To discharge Buckley, Article IV of Buckley's 1980 Employment Agreement required the Board to provide Buckley with reasonable notice and an opportunity to be heard.[18] Accordingly, in a letter dated September 22, 1986, the Board notified Buckley that at the its meeting scheduled for October 28, 1986, AI was to consider discharging Buckley for just cause. The letter also provided Buckley with notice of the six matters forming the basis for terminating his employment for cause. At the October 28, 1986 Board meeting Buckley appeared with his lawyers and argued the merits of the issue. In March 1987, upon a vote of the Board, Buckley was discharged for cause.

Viewing the above evidence in a light most favorable to AI indicates there are genuine issues of material fact showing that Buckley may have been justly terminated. The Board followed the requirements of Buckley's Employment Agreement, and enumerated the charges against Buckley. These issues preclude the granting of partial summary judgment.

### B. *11 U.S.C. § 502(b)(7)*

Buckley next asks for partial summary judgment on the issue of whether 11 U.S.C. § 502(b)(7) acts to cap his claims. For the reasons stated below, in the discussion of AI's partial summary judgment motions, Buckley's motion is denied.

### III. *AI's Partial Summary Judgment Motions*

### A. *Capping Buckley's Claims*

AI argues that Buckley's breach of employment contract claims, if any, are capped by 11 U.S.C. §§ 502(b)(4) and (b)(7). AI has requested partial summary judgment on these issues.

### 1. *11 U.S.C. § 502(b)(4)*

Title 11 U.S.C. § 502(b)(4) provides that claims for the services of an insider or an attorney of the debtor will be disallowed to the extent that such claims exceed the "reasonable value" of such services.[19] "Insider" is defined in 11 U.S.C. § 101(31). Where the debtor is a corporation, an "insider" includes directors and officers of the debtor.[20]

---

**16.** The Excess Benefit Plan provides Buckley with the difference between the amount of retirement benefit payable to him under AI's qualified pension plan, and the amount he would have received under the qualified pension plan if there were no maximum benefit limitation.

**17.** Section 10.2 of the Excess Benefit Plan dated September 2, 1975 provides in pertinent part:

"The Company ... reserves the right, by action of the Company's Board of Directors, to amend, alter, suspend or terminate the Plan in whole or in part or reduce, suspend or totally eliminate benefits, at any time, whether before or after the payment of benefits hereunder has commenced ..."

**18.** *See supra* note 4.

**19.** 11 U.S.C. § 502(b)(4) provides:

(b) [I]f such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount except to the extent that—

\* \* \* \* \* \*

(4) If such claim is for the services of an insider or attorney of the debtor, such claim exceeds the reasonable value of such services.

**20.** 11 U.S.C. § 101(31) provides that "Insider" includes—

\* \* \* \* \* \*

(B) If the debtor is a corporation—
(i) director of the debtor;
(ii) officer of the debtor;
(iii) person in control of the debtor;

Courts have construed the definition of an insider flexibly. An insider has been defined as any entity or person with a "sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." *In re Acme-Dunham, Inc.*, 50 B.R. 734, 739 (D.C.Me. 1985).

AI argues that because Buckley was an officer and director of the debtor, he was an insider. Buckley asserts, however, that because 11 U.S.C. § 502(b) uses the language "as of the date of the filing of the petition," that this is the appropriate time for deciding if one is an insider.[21] He maintains that since he was not an insider when AI went into bankruptcy, he is not an insider for the purposes of 11 U.S.C. § 502(b)(4).

The phrase "as of the date of the filing of the petition," however, modifies the amount of the claim. Further, insider in this context relates to the services performed. The contract services were services of an insider.

This court has previously decided that the relevant time for determining one's status as an insider, under 11 U.S.C. § 502(b)(4), is the time services were rendered and when the compensation contracts for such services were formed. *Allegheny Int'l., Inc. v. Pittsburgh Nat'l Bank*, Adv. Proc. Nos. 89–29, 89–33, slip op. at 8–11, 1990 WL 514353 (B.C.W.D.Pa. March 26, 1990).

In *Allegheny Int'l., Inc.*, this Court invoked 11 U.S.C. § 502(b)(4) to limit a portion of Alan Anderson's Key Man benefits. Anderson was at one time an executive vice president of AI and a member of AI's Board of Directors. Like Buckley, Anderson's employment with AI terminated before AI's petition in bankruptcy was filed. Anderson's termination occurred because of his death. Thus, despite the fact

that Anderson was not an insider when the bankruptcy proceedings commenced, the court permitted 11 U.S.C. § 502(b)(4) to cap Anderson's benefits.

The purpose underlying 11 U.S.C. § 502(b)(4) is to prevent officers and directors (insiders) of a debtor from extracting inflated amounts for their services at the expense of the creditors. *See Matter of 268 Ltd.*, 789 F.2d 674, 677 (C.A.9 Nev. 1986). This claim arises out of an insider relationship entered into while the insider was an employee of the debtor. It should not matter that the claim is of the nature of retirement benefits and that the claimant was not an insider when the bankruptcy proceedings commenced. The issue that is important for 11 U.S.C. § 502(b)(4) purposes is whether the claimant was an insider when the employment contract with the debtor formed.

■ To allow an insider to resign immediately before the debtor enters bankruptcy, and escape the reaches of 11 U.S.C. § 502(b)(4), would defeat the entire purpose of 11 U.S.C. § 502(b)(4). A more faithful reading is to hold accountable all claimants who were insiders when the advantageous insider employment contract was developed.

In the instant case, because Buckley was an officer and director of AI, by statutory definition he was an "insider." When Buckley entered into his employment relationship with AI he was an insider. Therefore, though Buckley was not an actual insider when AI went into bankruptcy, the provisions of 11 U.S.C. § 502(b)(4) apply: Buckley's claims are based on an employment relationship with AI formed while he was an insider. Consequently, his claims may be capped by 11 U.S.C. § 502(b)(4). AI's partial summary judgment motion is granted.

(iv) partnership in which the debtor is a general partner;
(v) general partners of the debtor; or
(vi) relative of a general partner, director, officer, or person in control of the debtor.

**21.** 11 U.S.C. § 502(b) states in pertinent part:

(b) [I]f such objection to a claim is made, the court, after notice and a hearing, shall determine *the amount of such claim* in lawful currency of the United States *as of the date of the filing of the petition*, and shall allow such claim in such amount except to the extent that.... (emphasis added).

### 2. *11 U.S.C. § 502(b)(7)*

■ Additionally, AI asks that this court rule that Buckley's claims are limited by the provisions of 11 U.S.C. § 502(b)(7). This section mandates a one-year limitation on breach of employment contract claims.[22]

Buckley argues that 11 U.S.C. § 502(b)(7) only applies to employment contract claims arising post-petition. Buckley relies on *In re Vic Snyder, Inc.* 23 B.R. 185 (B.C. E.D.Pa.1982) for support. *In re Vic Snyder, Inc.* involved a claim for damages arising out of the pre-petition termination of an employment contract. The *Vic Snyder* court ruled that only claims that flow from the bankruptcy or its immediate consequences are capped by 11 U.S.C. § 502(b)(7). *Id.* at 186. Thus, because the claim arose pre-petition the court declined to apply 11 U.S.C. § 502(b)(7).

The express language of 11 U.S.C. § 502(b)(7) includes claims that arise from pre-petition employment contract cessations. Under 11 U.S.C. § 502(b)(7), claims resulting from the termination of an employment agreement are limited to the compensation provided by the contract, without acceleration, for one year following the earlier of—

(i) the date of the filing of the petition; or

(ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract.

By the "earlier of" language, the Act clearly contemplates the termination of an employment contract prior to the filing of the bankruptcy petition. Employment contract claims that arise prepetition are subject to 11 U.S.C. § 502(b)(7)'s cap.

Other courts have concurred when holding that 11 U.S.C. § 502(b)(7) limits damages resulting from termination of an employment contract regardless of whether the termination occurred pre-petition or post-petition. *Johnson v. Beck*, 117 B.R. 461, 467 (B.C. D.C.Minn.1990); *In re CPT Corp.*, 1991 WL 255679, 1991 Bankr. Lexis 1730 (BC DC Minn 1991); *In re Murray Indus. Inc.*, 114 B.R. 749, 751 (B.C. M.D.Fla.1990). The *In re CPT Corp.* court stated that the express language and the legislative history of the statute do not support the premise that 11 U.S.C. § 502(b)(7) should be "limited to contracts terminated as result of the bankruptcy case or through post-petition rejection or as part of a deepening financial problem prior to bankruptcy." *In re CPT Corp.*, 1991 WL 255679 at *2, 1991 Bankr. Lexis 1730 at *8. The court further stated that there is nothing in the Bankruptcy Code or its legislative history to indicate that 11 U.S.C. § 502(b)(7) "should not apply to contract terminations which are deemed to be too remote from the filing of the petition." *Id.*

■ Buckley also argues that 11 U.S.C. § 502(b)(7) only applies to claims arising from the rejection of an executory contract. He asserts that because his employment contract was fully performed prior to termination, it is not executory, and the 11 U.S.C. § 502(b)(7) cap does not apply.

There is nothing, however, in the language of 11 U.S.C. § 502(b)(7) to suggest that the Bankruptcy Code only applies to the rejection of executory contracts. Title 11 U.S.C. § 502(b)(7) neither uses the bankruptcy term "rejection," nor refers to 11

---

**22.** 11 U.S.C. § 502(b)(7) provides in pertinent part:

(b) [I]f such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount except to the extent that—

\* \* \* \* \* \*

(7) if such claim is the claim of an employee for damages resulting from the termi-

nation of an employment contract, such claim exceeds—
(A) the compensation provided by such contract, without acceleration, for one year following the earlier of—
(i) the date of the filing of the petition; or
(ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus
(B) any unpaid compensation due under such contract without acceleration, on the earlier of such dates; ....

U.S.C. § 365(a) which addresses the assumption and rejection of executory contracts.

The plain language of 11 U.S.C. § 502(b)(7) makes the Code applicable to claims based upon employment contracts terminated pre-petition as well as post-petition. There is no basis for reading into the statute language limiting it to post-petition termination or to the rejection of executory contracts. Buckley's claims, if any, are subject to 11 U.S.C. § 502(b)(7)'s one year limitation. AI's partial summary judgment motion is granted.

## B. *Promissory Notes*

Between 1980 and 1982, Buckley borrowed $2,921,840 from AI through a series of four promissory notes. When Buckley's employment with AI ended, for whatever reason, Buckley was obligated to begin repayment of the principal of these loans.[23]

In a letter dated February 10, 1988, AI sent Buckley a repayment schedule, informing him that his first payment was due on April 15, 1988. Buckley failed, however, to make this payment or the next payment that was due July 15, 1988. After missing these payments, AI informed Buckley by a letter dated September 22, 1988 of his default. Pursuant to his promissory note agreement, the letter provided Buckley with thirty (30) days notice to correct his default, or the entire amount of the loan would be accelerated.[24] Buckley failed to cure his default, and has not made any payments since.

AI requests this court to determine on summary judgment that AI is entitled to the entire accelerated amount of the loans at 6% interest for a total, as of January 31, 1992, of $3,552,212.19. This amount is based on:

| | |
|---|---|
| Principal Amount | $2,921,840.00 |
| Accrued Interest as of 10/22/88 at 2% per annum | $ 47,260.36 |
| Total Amount Due as Accelerated | $2,969,100.36 |
| Plus Interest from 10/23/88 at 6% per annum | $ 178,146.02  per annum |
| Plus Interest due from 10/23/88 through 1/31/92 | $ 583,111.83 |
| Total amount due through 1/31/92 | $3,552,212.19 |
| Amount due through date of judgment | $3,552,212.19 + $486.74  per day |

---

**23.** Under either a resignation or termination for cause scenario, Buckley's promissory note agreements require the first principal payment to be due the first calendar quarter following the first anniversary of the termination of his employment. Buckley's repayment schedule was based on his termination for cause. Although Buckley challenges this involuntary termination, it was to his benefit with respect to the repayment schedules of the notes. If Buckley resigned on August 8, 1986, his first principal payment would have been due on October 15, 1987, the first calendar quarter following the first anniversary of the termination of his employment. By basing the repayment schedule on his termination for cause, Buckley's first principal payment was due on April 15, 1988.

**24.** Buckley's promissory note agreement states:

"[T]he holder of this note at the time any of the below described events occur, shall be entitled to declare the entire unpaid principal sum and all accrued and unpaid interest hereunder immediately due and payable at any time after the occurrence of one of the following events:

(a) the failure of the undersigned to make any payments hereunder by the due date therefor which failure shall continue for more than 30 days after written notice of such failure shall have been given to the undersigned. ..."

Buckley does not contest owing the principal amount of $2,921,840, but argues that the interest rate should be 2%, and it should not be accelerated.

■ In Pennsylvania the legal rate of interest is 6% simple interest, with no compounding. 41 Pa.S.A. § 202. Under Pennsylvania law, in cases of breach of contract, "interest is allowable at the legal rate from the date the payment is wrongfully withheld where the damages are liquidated and certain...." *Girard Bank v. John Hancock Mut. Life Ins. Co.*, 524 F.Supp. 884, 897 (E.D.Pa.1981) *aff'd without op.* 688 F.2d 820 (C.A.3 Pa.1982). When Buckley breached his contract with AI by defaulting on his loan payments, interest was due at 6% per annum from the date of the breach—October 23, 1988.

■ Further, Buckley's loan agreement clearly allows for the acceleration of the principal as well as all accrued and unpaid interest in the event of a default. By defaulting, the contract's procedures for accelerating the principal became applicable. Buckley owes AI 6% simple interest on the accelerated principal after the default date of October 23, 1988, plus 2% simple interest up to the date of his default. AI's summary judgment is granted in the amount, as of January 31, 1992, of $3,552,212.19.

■ Title 11 U.S.C. § 553 allows Buckley to set off what he will receive under his breach of employment contract claims against what he owes AI for the promissory notes.[25] Section 553(a) clearly provides that except in three defined circumstances, a creditor has the right to offset a mutual debt owed by the creditor to the debtor so long as both debts arose before the commencement of the bankruptcy action. *See Tradex, Inc. v. United States*, 65 B.R. 788,

791 (B.C. Utah 1986); *In re G.S. Omni Corporation*, 835 F.2d 1317 (C.A.10 Col. 1987); *In re Aspen Data Graphics, Inc.*, 109 B.R. 677 (B.C. E.D.Pa.1990). In the instant case, Buckley's employment contract claims and his breach of the promissory notes arose pre-petition. Buckley may therefore set off what he will receive under his employment contract claims against what he owes AI on the promissory notes.

## IV. *Conclusion*

Buckley's partial summary judgment motions are denied. There are genuine issues of material fact concerning whether he resigned all of his relationship and whether he was properly terminated for cause. A trial is ordered to determine whether the Board properly terminated Buckley for cause.

AI's partial summary judgment motions are granted. It is determined that 11 U.S.C. §§ 502(b)(4) and (b)(7) apply to Buckley's claims. In addition, it is determined that Buckley owes AI the principal of his four promissory notes plus accrued and unpaid interest as indicated in the Memorandum Opinion. Furthermore, Buckley may apply 11 U.S.C. § 553 to set off his loan obligations against his employment contract claims.

**25.** 11 U.S.C. § 553 provides in pertinent part:
(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that—